## SCOWS 9, 16, AND 24.[1]

### WALSH *v.* SCOWS 9, 16, AND 24.

*(District Court, S. D. New York. April 23, 1891.)*

SALVAGE—SCOWS DERELICT IN GALE—TOWED INTO PORT.

    A tug took in tow three scows loaded with mud from New York harbor, bound for the dumping ground outside of Sandy Hook. While on the way, so furious a gale arose that the tug, to save herself, cut the hawser when the scows were near the eastern end of Gedney's channel, and the scows thereupon went drifting out to sea in the gale and the ebb-tide. One man was aboard of each scow. The tug Olive

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

Baker, coming up the Jersey coast with a tow, perceived the scows, and, after anchoring her tow, went to their rescue, and reached them about seven miles from shore. Owing to the wind and sea, the master of the tug was unable to take the men off the scows. He therefore got a hawser to the scows, and brought them safely to port, through great difficulty and personal peril. The scows were cut adrift about 11 A. M. The gale did not moderate until 7 P. M. The scows were absolutely helpless, and practically derelict. They were worth $20,000. The value of the Olive Baker was $15,000. She was damaged by the service $500. *Held*, that the sum of $5,000 should be awarded as salvage.

In Admiralty. Suit to recover salvage.

*Wheeler, Cortis & Godkin*, for claimants.

*Goodrich, Deady & Goodrich*, for libelant.

BROWN, J. On the morning of November 22, 1890, the steam-tug John Hilliard took in tow upon a long hawser three scows, Nos. 9, 16, and 24, in single file, loaded with mud, bound for the dumping ground outside of Sandy Hook. The weather was mild when she started, but in the course of the forenoon the wind came on heavy from the northwest, and between 10 and 11 o'clock became so furious a gale, and the sea so rough, that the pilot and crew of the tug, to save their own lives, cut the hawser, and abandoned the scows, which thereupon went drifting out to sea in the gale and the ebb-tide. They were cut adrift at about the easterly end of Gedney's channel. The pilot of the tug testifies that he had previously made several vain attempts to manage the tow, and to bring it into smoother water. One man was aboard of each scow. They were Norwegians, and could not understand the hails from the tug. The pilot could not take the men off because the sea was too rough to permit his boat to get along-side. When the hawser was cut, he says, the water was "even with the half-door of the fire-room," and that "the boat was so much under water that he didn't think she would come up at all when he let go." He reached the lee of the Jersey shore. Not long afterwards, the pilot of the libelant's steam-tug Olive Baker, coming up the Jersey coast with a schooner in tow on a hawser, observed the scows adrift at a considerable distance, and, surmising that men were on board, and in danger of their lives, and being himself acquainted with that business, determined, after consulation with the crew, to attempt to go to their rescue. He thereupon took the schooner to a safe anchorage near the Jersey coast, and reached the scows a little to the southeastward of the Sandy Hook light-ship, about 7 miles from shore, but found it impossible, owing to the furious wind and sea, to take the men off the scows, and he thereupon determined to endeavor to tow them into smooth water. A hawser was finally attached to the scows, and by a circuitous course to the south-west they reached smoother water in the afternoon, and late at night got safely into port. The gale was heavy till about 7 P. M., when it moderated. The above libel is filed to recover salvage compensation for the above service.

The case is one of unusual merit. Not only the scows, but the lives of the men on board, were in evident peril. They had been abandoned by their own tug. Several other tugs had been requested to go to their rescue, and had refused, on account of the danger of the undertaking.

One witness testifies that in his opinion the scows would have ridden out the gale if not rescued; others thought not. Considering the fact that the gale moderated at 7 P. M., that the scows did not get into smoother water until about 3 P. M., and were therefore exposed to the gale for four hours without substantial injury, so far as appears, although from 3 to 7 P. M. the sea was probably rising, and the danger to such scows greater, it is not impossible that they might have ridden out the gale in safety. Though I cannot, therefore, treat the case as one of certain destruction of the scows except for the relief afforded by these salvors, the peril was evidently great. Abandoned by their own tug, though not strictly derelict, they were for the time being practically so, as the men on board were wholly destitute of any means of helping themselves. The anchors were very light, not adapted for service at sea, and if thrown overboard would have been of no use. The value of the scows was $20,000; that of the Olive Baker $15,000. In rendering the service, one side of the tug's house was stove in, and her boiler shifted. The expense of the necessary repairs, including demurrage during the necessary time for making them, and the loss of towage in abandoning the schooner, amounted to about $500. The chief elements in the case that entitle the salvors to a liberal reward are the imminent jeopardy of the tow, with the lives of those on board, and the great bravery, persistence, and skill of the pilot of the Olive Baker and his crew in going to and in rescuing the tow after it had been abandoned by one tug, and after others had feared and refused to attempt to save it. In rendering these services the salvors labored under peculiar difficulties, to some extent in peril of their own lives, and their success was perfect in rescuing the tow without substantial injury. Under such circumstances, I think an allowance of $5,000 no more than a suitable recognition of the peculiar merit of this salvage service. Of this sum the pilot and crew should receive one-half, and the owners of the tug the other half; the latter including the damage to the tug. Out of the allowance to the master and crew I allow $500 to the master, and the residue is to be divided among the master, engineer, and crew, in proportion to their wages.