## THE DON CARLOS.

### SPRECKELS et al. v. THE DON CARLOS.

*(District Court, N. D. California. October 5, 1891.)*

SALVAGE—COMPENSATION—STRANDING—SERVICES OF TUGS.

The bark Don Carlos, worth $15,000, with a cargo of nitrate of soda, worth $34,000, the freight being $4,000, stranded on South beach, near the entrance to the bay of San Francisco. News of the disaster was telephoned to San Francisco, and libelants immediately sent their tug-boat Alert to the scene. At her arrival, there was a rolling swell, sufficient, combined with the ebb-tide, to swing the bark around broadside to the shore, when it was reasonably certain that she would soon become so banked with sand as to render removal impossible. The captain of the Alert refused to render assistance, except on the master's agreement to pay $8,000 for pulling him off, which, after trying to obtain better terms, he agreed to do. Thereupon a hawser was made fast, and the tug began pulling, and prevented the bark from swinging. Soon afterwards the Relief and the Reliance, two powerful tugs, also owned by libelants, arrived, and the master of the bark agreed to pay $2,000 additional for their assistance. In about two and one-half hours they succeeded in pulling her off. She was then towed into the bay, and grounded upon the mud flats. The value of the tug Alert was $25,000, of the Reliance, $30,000, and of the Relief, $50,000, and the ordinary expense of maintaining the three in readiness for salvage service about $7,500 a month. None of the tugs were in any danger. *Held,* that the demand for $8,000 for the services of the Alert was exorbitant, and the agreement should be disregarded, and that $5,500 should be awarded for the services of the three tugs, to be apportioned among the ship, freight, and cargo, according to value.

In Admiralty. Libel for salvage.

*Andros & Frank,* for libelants.

*Charles Page* and *E. W. McGraw,* for claimant.

ROSS, J. This is a cause of salvage. The evidence shows that the principal services in question were rendered under contracts which, though not counted on in the libel, libelants claim should serve as a guide to the court in awarding compensation. If the contracts are not shown to be unfair and inequitable, that is doubtless true; but if, as is contended on the part of the claimant, they were exorbitant and unconscionable, they should be disregarded by the court in making the award. The case is this: On the 10th of July last, the bark Don Carlos, then on a voyage from a Chilian port to the port of San Francisco, laden with a cargo of about 1,000 tons of nitrate of soda, was approaching the entrance to the bay of San Francisco. At about half past 5 o'clock of the afternoon of that day, in consequence of a dense fog then prevailing, she was stranded at what is known as the "South Beach," at a point thereon about one mile to the southward of Point Lobos. At the time of the stranding the tide was ebb, the vessel under all sail, and proceeding at a speed of from 3 to 4 knots an hour. She brought up on the beach at a distance of from 150 to 200 yards from high-water mark. The master immediately made signals of distress by the firing of a rifle and revolver. A life-boat was quickly manned from the life-saving station, which was in the near vicinity, and went to the assistance of the vessel. News of the disaster was telephoned to the Merchants' Exchange, at San Francisco, and the tug-boat Alert, owned by the libelants, was

immediately dispatched by them to the scene of the disaster, and arrived there about 7 o'clock in the evening. Immediately on arrival, the captain of the tug asked the master of the bark what he would give him to pull him off, and the master replied $30 an hour, and $150 to tow him into the harbor. The captain of the tug refused the offer, when the master inquired what he would charge. The captain said, "$8,000." The master offered $4,000. In answer to the question by the proctor for the claimant, "What did you say when he offered you the $4,000?" the captain answered: "I said, '$8,000.' I said, 'Talk quick, or you will lose your ship;' that is what I said. *Question*. $8,000? Talk quick, or you will lose your ship? *Answer*. Yes; 'in a few minutes you will lose your ship.' *Q.* Did you mean that you would not take hold of him? *A.* Not for less than $8,000. I would not. *Q.* You would have let him stay there? *A.* Yes, sir." The bargain for $8,000 was accordingly made. In a few minutes a hawser was passed from the Alert, and made fast on the port quarter of the bark, and the tug commenced to pull the stern of the bark up to the sea, in order to keep her from swinging broadside to the beach. At this time there was a swell rolling, which, though light in comparison with what it sometimes is at that place, was sufficient, coupled with the ebb-tide, to cause the vessel to swing her stern around to the southward, and, unless checked, to bring her starboard side broadside to the beach. The sand at this point is a shifting sand, and when a vessel at this place swings broadside to the sea and shore, it is reasonably certain that she will, in a very short time, be so banked up by the sand that any attempt to get her off must prove futile. In about three-quarters of an hour after the Alert had thus made fast to the bark, the tug Relief, a powerful tug-boat, also owned by the libelants, arrived, and in a few moments more the Reliance, also owned by them, arrived. The master of the bark then made an agreement with the captain of the Relief, by which the Relief and Reliance should assist the Alert for an additional $2,000. Accordingly, the hawser of the Relief was made fast to the starboard quarter of the bark, and the hawser of the Reliance was made fast to the Relief. After the three tugs had been thus made fast, they began to pull on the bark, and so continued until about 10 o'clock in the evening, when, the tide having commenced to run flood, they succeeded in pulling her off. The vessel was then towed to a point in the bay of San Francisco, where she could be, and was, grounded on the mud flats. The Relief, equipped with powerful pumps, remained by her the remainder of the night, or a period of about nine hours, in case it should become necessary to pump her out. This was done at the request of the master, for which a charge of $25 an hour is made, which is the usual charge made by tug-boats in the bay of San Francisco for such a service. After striking the beach, the bark made more water than usual, but, as she had two pumps, worked by a steam-donkey, they kept her comparatively free of water.

About 15 minutes after the Alert arrived at the scene of the disaster, the tug Rescue, belonging to the Ship-Owners' & Merchants' Tug-Boat Company, arrived, and laid off some little distance from the vessel, but

did not tender her any assistance, though she could have been called in for that purpose had the master of the bark desired her services. Shortly after the arrival of the Relief and Reliance, two other tugs belonging to the Ship-Owners' & Merchants' Tug-Boat Company also arrived, and the superintendent of that company tendered their services to the master of the bark, which were declined. The agent of the libelants, after the arrival of their three named tugs, telephoned for another of their boats, the Active, to come out, but that order was almost immediately countermanded, the bark having been taken from the beach by the Alert, the Relief, and the Reliance.

The evidence shows that other vessels, under similar circumstances of wind and weather, have been stranded at or near the place where the bark in question was stranded, and, with two exceptions, were lost. In one of the excepted instances, the vessel was pulled off after laying there three days. The value of the Alert at the time the service in question was rendered was about $25,000, that of the Reliance about $30,000, and of the Relief, about $50,000. The ordinary expenses of maintaining these three tugs, including coal, oil, and wages, are, under ordinary circumstances, about $7,500 a month. The tugs are regularly employed in towing vessels in and out and about the harbor, and are also kept prepared and in readiness to render salvage services whenever occasion requires. The net value of the cargo of the Don Carlos was $34,000, that of the freight $4,000, and of the vessel $15,000.

The perplexing question is, what is a just award to be made the libelants, in view of all of the circumstances of the case? I do not think the amount of the contract for the services of the Alert ($8,000) is an equitable criterion by which to fix the compensation for her services. The tug came promptly, it is true, and she took on board from the life-boat a man, woman, and child, all of whom had been taken from the bark by the life-boat. But their lives were not in danger, nor was the tug in danger. There was but little wind, and she had plenty of water in which to move. In no respect that I can see did she take any particular risk in undertaking the service. The bark was in great danger of swinging round broadside to the beach, and of being so banked in with sand as to render it impossible to pull her off; but for the captain of the Alert to demand $8,000 for making fast to and pulling on her, under the circumstances of the case, was, in my opinion, exorbitant; and, that being so, his refusal to render the bark any assistance until the master agreed to pay him that sum renders it proper for the court to disregard the master's consent to do so. And if the testimony of the captain of the Alert, to the effect that he would have left the vessel to her fate unless her master consented to his demand, be true, it would not appeal very strongly to a court of admiralty in behalf of a high award for his services. It can hardly be believed, however, that the captain would have acted as he said he would, but rather that he would have rendered the service, and left it to a court of admiralty to award him what was just, under all of the circumstances of the case. While there was no danger to life, the bark, as has already been said, was in great danger of swing-

ing around, and becoming so imbedded with sand as to render it impossible to pull her off. Other vessels at or near the same place had suffered the same fate. Besides, she was pounding quite heavily, and was making more water than usual. There was danger, therefore, that her cargo, consisting of nitrate of soda, would, at least to some extent, get wet, and become ruined or greatly damaged.

The court will also take into consideration the fact that the services of the libelants' boats were rendered promptly and effectively, as well as the fact, shown by the evidence, that the libelants maintain a fleet of five powerful and well-equipped tug-boats for the purpose, not only of towage, but of assisting vessels in distress; that at night one of them is always "on watch," with steam up, ready to start at a moment's notice, and the others lie with banked fires, and can be got ready and under way in from 10 to 15 minutes. The value and expense of maintaining those of libelants' tugs that rendered the services here in question have already been stated; that of the remaining two of their fleet does not clearly appear, but from the testimony it seems probable that it is not less than that of the Reliance and Alert. It also appears that some of the libelants' tugs are sometimes sent to sea in search of vessels in distress, at heavy expense, and without receiving any reward. This fact it is also proper to consider in making an award for the services rendered in the present case; but it must not be overlooked that the Don Carlos was not wholly dependent upon the tugs of the libelants, for those of the Ship-Owners' & Merchants' Tug-Boat Company were at hand, and could have been availed of. The court is disposed, as admiralty courts always are, to make the award liberal, but I think, in view of all the facts and circumstances of the present case, that $5,500 is a liberal award for the services rendered by the libelants, over and above $225 for the services of the Reliance in staying by the bark during the night of July 10th. For these amounts, with costs, a decree will be signed for libelants, the amount of which to be apportioned among the ship, freight, and cargo, in proportion to their respective values, as above stated.