## THE PINMORE.

### (District Court, D. Washington, N. D. February 27, 1903.)

### No. 2,191.

1. SALVAGE—RESCUING ABANDONED BARK—AMOUNT OF AWARD.

Libelants tug Tyee, worth $90,000, was sent to the assistance of a vessel reported to be in distress off the Washington coast. The weather was stormy, and navigation dangerous. She found the British bark Pinmore anchored, and in a leaking and helpless condition, near a dangerous shore, in the stormy season, and deserted by her captain and all the crew, with nothing except the fact that she was anchored to indicate that she was not a derelict. She was promptly and skillfully rescued and taken into port, some of the officers and crew of the tug undergoing considerable peril and hardship. After being salved, the Pinmore was worth $63,000. *Held*, that the master of the Tyee was justified in regarding the Pinmore as a derelict, and in taking possession of and salving her, and that she should be treated as legally derelict in awarding salvage; that libelant was entitled to an award of $12,000, besides expenditures made in caring for the vessel, and the crew to $6,200 additional.

In Admiralty. Libel in rem against a four-masted bark worth $63,000 for salvage, the bark having been found at anchor near a dangerous shore, in the stormy season, and in a leaking and helpless condition, and apparently deserted by her master and crew. Heard on the merits. Salvage aggregating $19,610 awarded to the owner of the rescuing vessel, her officers and crew.

Struve, Allen, Hughes & McMicken, for libelant.

Preston, Carr & Gilman, for claimant.

HANFORD, District Judge. The four-masted bark Pinmore, a British vessel, on a voyage from the port of Santa Rosalia, Mex., to

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C C. A. 280.

Portland, Or., in the month of November, 1901, having sand ballast and no cargo, sprung a leak, and the water was permitted to increase in the hold to such an extent that it washed the sand ballast into the limbers, and after she had been leaking about three weeks the sand clogged her pumps, so that it became impossible to discharge the water as fast as it came in. In this condition the vessel encountered heavy weather off the mouth of the Columbia river, and was driven northward, and the rolling of the vessel with the water in her hold caused her ballast to shift so that she listed over to an angle of 45 degrees, and became unmanageable, as she could not be steered nor maneuvered. In her helpless condition, as described, the vessel drifted towards the coast of this state, until she was about 20 miles north of Gray's Harbor, and between 75 and 80 miles south from Cape Flattery, and 3 miles off shore, when her anchors were dropped in 14 fathoms of water. After dropping the anchors, her captain and crew remained with the ship all of one day, with signals of distress flying, and continued calling for help after dark by sending rockets, but without success in calling any vessel to their assistance. The captain consulted with his officers, and also with the entire crew, and it was their unanimous opinion that they were unable to do anything to improve the situation of the ship, and that their lives were in danger if they remained on board during the night, as the barometer was falling, indicating a storm coming.

The hatches were open, and they were not able to close them on account of the vessel being nearly upon her beam ends, so that leaking as she was, and rolling heavily, it was to be expected that she would soon become water logged, and sink by the water pouring into her hold through the open hatches. In his evidence, Capt. Jamieson testified that the hatches were all battened down, but I am obliged to disbelieve that statement, as the evidence to the contrary is convincing. The captain believed his vessel was lost, and, rather than leave her afloat, he gave orders to open one of her side ports, so that she would be sooner filled and sunk, and pursuant to his order the sailmaker went into the hold and partly removed the fastenings, when the captain changed his mind, believing that if the vessel were sunk in fourteen fathoms of water she would be a greater menace to other vessels navigating along the coast than if she continued afloat, and he countermanded his order to scuttle the ship. At 10 o'clock at night, December 4, 1901, the entire ship's company left the vessel in two of the ship's boats, but on account of the surf rolling on the beach they did not risk a landing in the darkness, and before morning they drifted some 15 miles to the northward, and then in making a landing one of the boats was capsized, and eight of the crew were drowned in the surf. The others traveled along the beach until they were able to find a conveyance which took them to Hoquiam, on Gray's Harbor, and upon arrival there they learned that the ship had been rescued and towed into Puget Sound. The controlling motive under which the master and crew left the vessel in the nighttime was self-preservation. Any idea which may have been in the minds of any of them of seeking assistance to save the vessel was vague and indefinite, and amounted to nothing more than a mere hope, based upon a mere possibility.

The manager of the Puget Sound Tug Boat Company, libelant in this case, upon receiving information that a four-masted bark was at anchor in a dangerous position, sent the tug Tyee to her assistance, and the rescue was promptly and gallantly accomplished. The Tyee having a ship in tow, bound outward, was returning to Clallam Bay, for the reason that the conditions of wind and weather were such that it was deemed unsafe to go out, when the orders were brought to her by a messenger boat to go to the relief of a vessel in distress, and without unnecessary delay the order was obeyed, the Tyee going out when the conditions were such that her captain would not have proceeded upon any other mission. The Pinmore was found in the condition in which she was left as before described. Her captain did not even leave a notice posted on the vessel, or in the cabin, that he retained any control of the ship, or indicating an intention on his part to return. The ship was afloat, and in a helpless condition, near a dangerous shore, in the stormy season, and deserted by her captain and every member of her crew, with nothing whatever to repel the natural presumption that she was derelict, except that she was held by her anchors.

It is my conclusion that the captain of the Tyee was legally justified in taking possession of the vessel without a request from her owners or master, as a derelict, and that in awarding salvage she should be treated as being legally derelict. 9 Am. & Eng. Enc. of Law (2d Ed.) 395–6; The Coromandel, 1 Swab. 205; The Laura, 14 Wall. 336–345, 20 L. Ed. 813.

The evidence shows that the officers and crew of the Tyee were all willing, courageous, and skillful in effecting the rescue, and some of them were exposed to peculiar perils and performed arduous labor. I will not recite the particulars, but in the sums awarded I intend to indicate my opinion of their meritorious services. The libelant put at risk the tug Tyee, which was at the time worth $90,000, besides employing others of their vessels as messenger boats and assistants to the Tyee, and also expended, in completing the salvage service and in paying the watchmen who were rightfully employed in guarding the vessel until she was taken in custody by the marshal, sums of money aggregating $1,410.

I find the value of the Pinmore in the condition in which she was after being salved, and before necessary repairs were made, to have been $63,000. In consideration of all the facts and circumstances, the following sums are deemed to be reasonable and just salvage, to wit: To the libelant, $13,410; to Capt. Bollong, $1,200; to O. Beaton, mate of the Tyee, $800; to Lars Rasmussen and John Horgan, quartermasters, each $600; to G. Wiman, sailor, $500; to A. N. Holcomb, chief engineer, $700; to J. A. Sheld, assistant engineer, $500; to John Coulter, Gustav Osthenyeck, James Frasier, Gilbert Hobbs, John Flynn, and A. A. Elwood, each $200; and to John Murray, cabin boy, $100; and I direct that a decree be entered allowing the said amounts, with interest thereon at the rate of 6 per cent. per annum from the 1st day of January, 1902, and costs.