## THE BENJAMIN A. VAN BRUNT.

### (District Court, E. D. Pennsylvania. November 16, 1908.)

### No. 30.

SALVAGE (§ 34*)—AMOUNT OF COMPENSATION—RESCUE OF SCHOONER DISABLED AT SEA.

> A schooner laden with railroad ties, and worth with her cargo and freight from $26,000 to $40,000, was so injured in a collision off the New Jersey coast, while on a voyage from Savannah to New York, that she became water-logged and settled until the waves washed her decks. While not in danger of sinking owing to the nature of her cargo, she was practically helpless, being unable to use her sails or anchors, and in some danger of being driven ashore, and of further collision with other vessels at night. In response to her distress signals libelants' tug, on the way to Baltimore with three tows, also took her in tow to the Delaware Breakwater, where she was left and afterward temporarily repaired and taken to New York with the larger part of her cargo. In performing the service, the tug deviated from her course some 35 miles and consumed 30 hours. She was worth, with her tows and cargo, some $200,000. The service was not attended with any special danger. *Held* that, while it was a salvage service, it was not of a high order of merit, and that the tug was entitled to a salvage award of $3,500.

> [Ed. Note.—For other cases, see Salvage, Cent. Dig. § 81; Dec. Dig. § 34.*]

In Admiralty. Suit for salvage.

Howard M. Long, for libelant.
Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. This is a suit in which the respondent admits that the libelant rendered the services of a salvor, but objects to the estimate put upon their value.

The facts are as follows: The schooner Benjamin A. Van Brunt is a four-masted vessel of 1,146 tons, and on May 3, 1907, was prosecuting a voyage from Savannah to New York, carrying a cargo in the hold and on deck of about 19,700 pine railroad ties. At 11 o'clock in the night of that day she was much injured by a collision with another schooner, five or six miles northeast of the Five Fathom Bank lightship. Her bowsprit, fore rigging, and much of her headgear were carried away; one of her lumber ports was stove in; and her anchors were forced overboard, hanging in such a position that they could neither be raised nor lowered. As a consequence of her injuries, she speedily became water-logged, and sank so deep that the waves dashed over her decks continuously. Some of her hatches were burst open, and several hundred of the ties, both from the hold and the deck, were dashed away. Although the buoyant nature of her cargo removed all danger of sinking, she was practically helpless. She could not use her sails because of the risk that she might turn over if the at-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tempt was made to hoist them, and she had no auxiliary power. Neither could she use her pumps, even if they would have been effective. The crew and officers, consisting of nine persons, had no other place of refuge than the top of the after house, and no other food than a barrel of hard bread. The nearest land was Sea Isle City on the New Jersey coast, about 10 miles to the westward, and the schooner was therefore directly in the track of coasters and was exposed to the danger of a second collision at night or during a possible fog. Moreover, if the wind should get into the east she would almost certainly be driven ashore, and might become a wreck. Her situation had this advantage, however, that she could not escape observation, and was sure to be picked up sooner or later. Both the wind and the sea were probably high when the collision occurred, and they continued to be rather severe during the early part of May 4th, for in the morning of that day a tramp steamship made some effort to take the schooner in tow, but was finally obliged to abandon the attempt. About two o'clock in the afternoon, the tug Savage, of Baltimore (owned by the Consolidation Coal Company), towing a string of three barges to her home port, sighted the schooner, which was then flying a signal of distress, and came near to investigate her condition. By this time the wind was no more than fresh from the west or northwest, and the sea, while still choppy, had gone down so much that the tug's approach required little more than ordinary caution. The master of the schooner asked to be towed to the Delaware Breakwater, and the tug agreed to undertake the service, but the subject of compensation was not referred to. The schooner was accordingly placed first in the tow, the hawser of the foremost barge being detached from the tug and fastened to the schooner's stern, and a new 10-inch manila hawser about 900 feet long, belonging to the tug, being fastened to the schooner's bow. This maneuver was effected without any serious difficulty. There was the usual need for caution lest the tug and schooner should collide, and also lest the crew of the tug should become entangled in the hawser and suffer injury, but there was no extraordinary peril for either of these reasons, and the rearrangement of the tow was speedily accomplished.

Apparently, the shortest course to the breakwater would have been across Five Fathom Shoal, and this direction would no doubt have been pursued if the tug had known that the anchors of the schooner were not hanging below her keel. They could not be seen, however, and the master of the schooner was unable to inform the tug how much chain had run out. In order, therefore, to be sure of having enough water, the tug rounded the eastern and southern edges of the shoal, and thereby lengthened the voyage by several miles. She reached the breakwater safely about noon of May 5th, and placed the schooner on the mud, at her master's request, proceeding promptly thereafter on her course toward Baltimore. The voyage from the point where the tug took hold of the schooner had been neither eventful nor especially hazardous. Owing to the water-logged condition of the vessel, the schooner's rudder was abnormally deep in the water, and, although it was used during the night, it was less serviceable than it

would otherwise have been, and increased to some extent the difficulty of towing the injured ship. Her side lights were not in their usual place. Some attempt was made to show them, but it seems to have been confusing at the best, and this added an element, but not a very considerable element, of danger to the progress of the tow during the night. A more careful lookout by the tug was also rendered necessary by reason of the schooner's presence. The speed of the Savage, although not more than 3½ miles at the most, was as fast as she was able to go. Her engines were run to their capacity, and consumed from 15 to 17 tons of coal extra in performing the salvage service. The whole distance covered by the tug was 56 or 57 miles, but, while the breakwater lay to the west of her route to Baltimore, the general direction to both places was the same, and the total deviation from the original course was probably not more than 35 miles, and the time lost not more than 30 hours. The schooner was afterward towed to Philadelphia by another tug, was repaired temporarily at that port, and afterwards towed to New York—the towing charges for both services and the cost of repairs aggregating about $1,100—and delivered there 16,500 ties, this being what was left of her cargo. She thus earned, and was paid, a gross freight of $3,052.50, from which certain deductions should be made, the net amount of the freight being a matter of dispute.

The total value of the tug, her three barges, and the cargo, of the barge that was loaded—the other two being light—is given by the master as $202,500; and, while this sum seems to me to be excessive, no testimony to the contrary was offered, and I have no means of correcting the estimate, if correction be needed. The monthly wages paid to the officers and crew of the tug were $850. It is more difficult to arrive at the value of the schooner, her cargo, and the freight, since there is conflicting testimony upon each of these subjects. The totals appearing from the testimony range between $26,000 and $40,000, but I do not think it is essential to determine with accuracy what sum approaches most nearly to the truth. When the schooner reached Philadelphia, an offer of $2,500 as compensation for the salvage service was made on her behalf to the libelant before the suit was brought, but no legal tender of this sum was made, and the money was not paid into court after the action was begun. The offer was refused, and a libel was filed asking for an award of $15,000.

Upon these facts the only question is the amount for which a decree should be entered, and the elements that should influence the court in coming to a conclusion appear in the foregoing statement. It would do little good to discuss them in detail. It is their total effect that is decisive, and this effect may, and probably will, vary as the minds vary to which these elements are presented. For myself, I can only say that I do not regard the libelant's service, although it was no doubt meritorious, as entitled to a high rank. It ought to be well paid, but the sum demanded in the libel is out of the question. Taking everything into account, my best judgment is that the service will be adequately compensated by the sum of $3,500, and for this amount, with costs, a decree may be entered.