## THE WILLIS A. HOLDEN.

(Circuit Court of Appeals, Ninth Circuit. November 9, 1909.)

No. 1,720.

SALVAGE (§§ 13, 34*)—NATURE OF SERVICE—AMOUNT OF COMPENSATION—"SAL-
VAGE SERVICE."

The schooner Holden, laden with lumber, left Willapa Harbor, Wash.,
for China, but when 150 miles out lost her rudder and rudder post in a
storm. She jettisoned a part of her deck load and rigged a jury rudder,
with which she worked her way back to the strait of Juan de Fuca, which
she reached in the night after 13 days. In the morning she hoisted dis-
tress signals. During the day she sailed across the strait, but came back
to the same place on the Washington side with her jury rudder wrecked
and with a list of some 9 degrees by shifting of cargo. Toward night the
steam schooner Nelson came to her assistance and agreed to tow her to
Port Townsend. After considerable difficulty and danger a line was
passed aboard and a start made; but during the night, which was very
rough, the hawser parted three times, and it was with difficulty that the
Holden was again picked up. At noon the next day she was left safely
anchored in Port Angeles. Held, that the service was clearly a salvage
service, and entitled to be compensated as such, and that an award to
the Nelson and her officers and crew of $4,800 was justified; the Holden
and her cargo being worth about $43,000.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 23–25, 80–83;
Dec. Dig. §§ 13, 34.*

For other definitions, see Words and Phrases, vol. 7, pp. 6316, 6317.]

Appeal from the District Court of the United States for the North-
ern Division of the Western District of Washington.

Libel in rem for salvage against the four-masted schooner Willis
A. Holden, by the Charles Nelson Company, a corporation, owner of
the steam schooner Charles Nelson, and her master and crew. De-
cree below for the libelants in the sum of $4,800. Claimant appeals.
Affirmed.

H. R. Clise and Geo. H. King, for appellant.

Kerr & McCord, for appellees.

Before GILBERT and MORROW, Circuit Judges, and HUNT,
District Judge.

MORROW, Circuit Judge. The four-masted schooner Willis A.
Holden, owned by the Globe Navigation Company, Limited, sailed
from Willapa Harbor, in the state of Washington, on November 27,
1907, bound on a voyage for Shanghai, China, with a cargo of 1,294,-
000 feet of lumber, valued on the manifest at $15,950. On the sec-
ond day out, and at a distance of about 150 miles west of the Wash-
ington coast, the schooner encountered rough weather and became
disabled by the loss of her rudder and rudder post, whereupon, to
save the schooner and her cargo, the master and crew jettisoned about
25,000 feet of the deck load of lumber. They thereupon rigged a jury
rudder and navigated the vessel into the strait of Juan de Fuca,
the entrance to which is about 140 miles north of the harbor from
which the schooner sailed. The schooner reached the strait on the
early morning of December 12th, 15 days after sailing from Willapa

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Harbor, and 13 days after having lost her rudder and jettisoned a part of her cargo. What the schooner was doing during this time does not appear from the evidence. The strait of Juan de Fuca, from the entrance eastward for a distance of 50 miles, has an average width of 11 miles. The island of Vancouver, British Columbia, is on the north, and the state of Washington on the south, side of the strait. Cape Flattery, on the south side of the entrance to the strait, is the northwestern extremity of the state of Washington. The lighthouse for this point is on Tatoosh Island, about three-eighths of a mile northwestward from the cape.

The master in his testimony states that on December 12th the schooner had no rudder and the deck load had partly shifted; that she had a list to port of about 9 degrees; that at daylight on December 12th, somewhere off Waaddah Island, he hoisted signals of distress fore and aft. The signal at the fore was a square flag with a round ball below. The meaning of this signal was, "I want immediate assistance." The signal aft was a flag with the letters "C.N." (N.C.), the meaning of which was, "Can you give me assistance in the way of ......?" The distress signals are those provided in article 31 of international rules of May 28, 1894 (28 Stat. 83, c. 83 [U. S. Comp. St. 1901, p. 2871]). The distance from Tatoosh Light to Waaddah Island, near the Washington shore, is about 5½ miles. The wind on the morning of December 12th at Tatoosh Island, as reported by the Weather Bureau, was from the southwest from midnight to 4 a. m., and from the south from 4 a. m. until 8 a. m. The average hourly velocity of the wind was 29 miles. High water on that morning at Neah Bay, just west of Waaddah Island, was at 6:57. Tide Tables for the Pacific Coast by the Coast and Geodetic Survey, 1907. The disabled schooner must, therefore, have come into the strait with the aid of a favorable wind and on a flood tide. From the position off Waaddah Island, where the signals of distress were set on the Holden, the master testified that he sailed the schooner until he came to a position off Sombrio Point on the Vancouver shore; the schooner heading towards the shore. From Waaddah Island to Sombrio Point is 13¾ miles. The master then tried to get the schooner around, so as to head for the American shore; but, failing in this, he set his sails so that he was able to gather sternway, and in this way he sailed stern foremost across the strait in the direction of southwest by south, and at about 4 o'clock in the afternoon he was again off Waaddah Island, where he was in the early morning. The wind at that time was from the northeast and the tide running flood. The sea was rough. The jury rudder had drifted apart and was a wreck, laying alongside the schooner. It was useless for steering purposes. The schooner was crossways to the wind and was drifting across and towards the entrance to the strait.

At about 4 o'clock the steam schooner Charles Nelson, bound on a voyage from San Francisco to Seattle, came around Cape Flattery and entered the strait, and soon after discovered the Holden heading across the strait flying signals. The master of the Nelson consulted his book of signals, and found that the Holden's signals meant, "In distress; want immediate assistance." The Nelson proceeded to the relief of

the schooner, and, steaming up close to the Holden, asked the master what he wanted, or if he wanted assistance. The master of the Holden replied that he did; that he wanted to be towed to Port Townsend. The master of the Nelson replied that he would tow him. The Nelson then passed alongside of the Holden, and, turning around abaft, came up on the starboard side. The testimony is conflicting as to what passed between the masters of the two vessels at this time. The master of the Nelson testified:

"He asked me how much I wanted for it. I told him I could make no bargain; I could not state now; if he wanted any assistance I would do so, and if he did not want it to say so, and I would go on my way. He told me then he had better take assistance, and for me to tow him. I told him: 'All right.' I steered a little further off, and I told the mate to get all hands on deck, and we took our 10-inch line on deck, and made one end fast to our towing bitt, and got another 3-inch line ready to bend onto it, and then we steered towards the Holden, went on the weather side of him. Before that I see that there was some wreckage afloat alongside of her. Before that, as I came alongside, the captain told me: 'There is nothing the matter with me.' I told him: 'I don't care what is the matter; if you want any assistance I will give you assistance.' I could see he was in distress. He had signals of distress up. I had no time to have an argument with him, because it was getting dark. After we got alongside of him — We made two or three attempts to get alongside of him. He had some wreckage floating on the weather side. There was a spar or planks, and wire attached to it. So I did not know how far that was drifting towards the weather side, so I steered as close as I could towards him. Then I rounded her up and backed down towards her; but the wind threw the bow back again, and I think it was two or three times that we attempted to get a heaving line on board of him, and we got a line on board, a heaving line, and bent that onto the 3-inch line, and the 3-inch line was bent onto the 10-inch hawser, and we also bent a big shackle onto the big hawser. Then I told the captain to shackle that hawser with the big shackle onto his anchor chain, so that I could tow on that. Then he told me that it would take him a couple of hours to get his anchor chain ready; the best he could do would be to make a line fast to that bitt. I told him: 'All right'—to make it fast to his bitt, and let me know as soon as he had it fast. After he had it fast, that must have been about pretty nearly close onto 5 o'clock."

Hansen, the first mate of the Nelson, who heard the conversation between the two captains, testified:

"The captain of the Nelson asked the captain of the Holden if he wanted assistance, if he wanted to be towed, and the captain of the Holden said that he wanted to be towed to Port Townsend; but there was no price to my knowledge, or in my hearing, agreed on. The captain of the Nelson said he would tow him to Port Townsend, but he would make no bargain. He would leave it to be set later on. He (the captain of the Holden) said: 'All right.' And he got the hawser. I did not hear him say anything about salvage. Some time after getting the hawser, he said something to the effect that it would be a tow. Our captain said: 'All right; I will tow you.' That is, while we were in the act of getting the hawser onto the Holden."

MacRae, the second mate of the Nelson, who also heard the conversation between the captains, testified:

"We came up alongside, and our captain spoke to him, and he wanted to know if he wanted any assistance. He said: 'Yes; will you tow me to Port Townsend?' Our captain said he would; he would tow him to Port Townsend. Then he asked him how much he wanted to tow him to Port Townsend. He said: 'I will make no agreement with you. I cannot make no agreement.' Afterwards he says: 'I want you to understand that it won't be a salvage job.' Our captain says: 'I cannot make any agreement with you at all as to

that. If you want me to help you I will; if not, say so, and I will proceed. If you want to take my line, all right. Do you want to take my line?' our captains says. He says: 'Yes; I will take your line.' "

The master of the Holden testified: That the captain of the Nelson asked him, "What do you want?" And he asked the captain of the Nelson, "Can you tow me to Port Townsend?" The captain of the Nelson replied, "Yes; I will tow you." The captain of the Holden then asked, "How much do you want to tow me to Port Townsend?" The captain of the Nelson replied, "I don't want to make any agreement." He said, "You lost your rudder?" And the captain of the Holden said, "Yes." The Nelson then passed, and turned around abaft, and came alongside again, when the captain of the Holden said to the master of the Nelson, "Captain, I understand this to be a towage job, and not a salvage job." That the master of the Nelson did not reply at first, when the master of the Holden said: "I don't want to take your line, except you consider this a towage job and not a salvage job." To which the master of the Nelson replied: "All right; I will tow you."

Carlson, mate of the Holden, testified that the captain of the Nelson hailed the captain of the Holden, and he said, "What do you want, Captain?" The captain of the Holden asked if he would tow him to Port Townsend. The captain of the Nelson said, "All right; I can do that." The captain asked him what he would charge to tow him to Port Townsend. He said he would not make any agreement for towing. The captain of the Holden said he would not take his line, except he would consider it towage, and not salvage. The captain of the Nelson said, "All right; I will tow you."

The carpenter of the Holden testified:

"The captain of the Nelson came up on one side of us, and he sang out to the captain of the Holden, and he says, 'What do you want?' and he says, 'I want a tow,' and the Chas. Nelson came right around on the side, on the starboard bow, and the captain of the Holden sung out again, 'Captain,' he says, 'this is only a tow; if you want salvage out of it, I won't take your line,' and the captain of the Chas. Nelson, he said, 'All right,' and he took the line."

The hawser passed to the Holden by the Nelson was a new, 10-inch Manila hawser. At the time the hawser was being passed the wind was high and a heavy swell running. In this state of the weather there was great danger to both vessels in the Nelson going alongside of the Holden in its unmanageable condition. The situation required great care, and in exercising this care it took the Nelson an hour or more to get the Holden in tow. After this was accomplished, the Nelson proceeded with her tow in the direction of Port Townsend, a distance of about 80 miles. About midnight the wind changed to the southwest, and the Holden sheered from side to side, steering badly. About half-past 12, and after the tow had been taken about 35 miles, the hawser parted at the Nelson's rail, and the Nelson's mate called all hands on deck to again take the Holden in tow. The Nelson then passed a 6-inch hawser to the Holden to hold her and prevent her from drifting over onto the Vancouver shore. About 3 o'clock the 6-inch hawser parted. By this time the Holden had taken in the 10-inch hawser, and this was passed on board the Nelson and made fast. The

Nelson again proceeded with her tow, and at about half-past 5 or 6 o'clock in the morning the 10-inch hawser parted the second time, this time near the Holden. The two vessels were then near Race Rock, on the Vancouver shore, and in a dangerous position. The Nelson hove in her hawser by steam. It took an hour and a half to pick up the Holden. After the hawser had been made fast on her, the Nelson steamed across the strait in the direction of Port Angeles on the American side, a distance of about 11 miles. In rounding Ediz Hook to get into Port Angeles, the Holden took a sheer, and the 10-inch hawser parted the third time. The Nelson again went alongside the Holden to pass the hawser, when the captain of the Holden said he was in smooth water and in no danger. The captain of the Nelson said, "It was quite a rough night." The captain of the Holden replied that "It was a dirty night, and you did well." The Nelson then took the Holden in tow, and at about noon on December 13th anchored her safely in Port Angeles. The evidence is that the night was very stormy and dark, and the sea rough. The captain of the Nelson testified that it was one of the worst nights he ever experienced. MacRae, the second mate, testified in his experience up and down the Juan de Fuca Strait he never had worse weather than they had that night since he had been running up there. At times the wind was blowing a gale, with rain, hail, and snow. The Weather Bureau at Tatoosh reported that the wind was from the west from midnight to morning, and the average hourly velocity was 25.5 miles; that at 4:15 a. m. the maximum velocity of the wind was 52 miles per hour from the west for 5 minutes.

The Charles Nelson is a steam schooner of 890 horse power. Her gross tonnage is 629 tons. Her net tonnage is 397 tons. She is 196 feet in length, and 37.8 feet in width. She had on board on December 12th 12 or 15 passengers and 300,000 feet of lumber. The schooner was of the value of $75,000. The Willis A. Holden is a four-masted schooner. Her gross tonnage is 1,188 tons. Her net tonnage is 1,040 tons. She is 210 feet in length, and 42 feet in width. She had on board on December 12th a cargo of lumber valued at $15,500. The schooner itself was of the value of $27,500.

The court below held that the services rendered the Holden by the Nelson and her officers and crew was a salvage service, and awarded the Nelson $3,500, her master $300, her first mate $100, her second mate $50, and each of the 20 members of the crew appearing as interveners $40, making a total of $4,850. It is contended by the appellant that the compensation for the services rendered to the Holden was to be based upon a towage service, and not a salvage charge.

In the case of The Reward, 1 W. Rob. 177, Dr. Lushington said:

"I apprehend that mere towage service is confined to vessels that have received no injury or damage, and that mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damage or accident."

In the case of The Charlotte, 3 W. Rob. 68, 71, Dr. Lushington said:

"All services rendered at sea to a vessel in danger or distress are salvage services. It is not necessary, I conceive, that the distress should be actual or immediate, or that the danger should be imminent and absolute. It will be

sufficient if, at the time the assistance is rendered, the ship has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered."

In the case of The Phantom, L. R. 1 A. & E. 58, 60, the same great admiralty judge said:

"I am of opinion that it is not necessary there should be absolute danger in order to constitute a salvage service. It is sufficient if there is a state of difficulty, and reasonable apprehension."

In McConnochie v. Kerr (D. C.) 9 Fed. 50, 53, Judge Brown, of New York, one of America's great admiralty judges, said:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger."

In support of this rule Judge Brown refers to the cases which have just been cited from Dr. Lushington.

In the case of The Flottbek, 118 Fed. 954, 55 C. C. A. 448, this court, referring to the towage of a disabled vessel in the locality where the services now under consideration were performed, said:

"There is a marked and clear distinction between a towage and a salvage service. When a tug is called or taken by a sound vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage; but if the vessel is disabled, and in need of assistance, it is a salvage service. In cases of simple towage, only a reasonable compensation is allowed, as upon a quantum meruit. In case of salvage, the award is upon a broader and more liberal scale, as we have before stated."

The court had previously defined a salvage service in the following language:

"Salvage is decreed by courts of admiralty as a reward for services successfully rendered in saving property from maritime damage, not on the principle of a quantum meruit, or as compensatory remuneration, but as a reward for perilous services, and as an inducement to seamen and others to readily engage in such undertakings and assist in saving life and property. Danger, peril, and a successful deliverance therefrom, either by voluntary effort, special request of, or by contract with the owner, constitutes a case of salvage, whether rendered by one or more salvors. Each salvor that renders a meritorious service, directly aiding in the rescue and saving of the property, is entitled to a salvage award."

It is contended by the appellant that the Holden was not in distress at the time she was taken in tow by the Nelson; that her signals of distress, flying at the time she was hailed by the Nelson, had been hoisted in the early morning. The master of the Holden did testify that he hoisted these signals at daylight in the morning for the purpose of attracting the attention of the lighthouse people on the American side, so that he would be reported; that there was a telegraph station from there; and that he could get into communication with either the towboat people or the Globe Navigation Company, the owner of the vessel. He further testified that the signals "were forgotten to be taken down." But the master appears to have overlooked the fact that the International Code of Signals provides for precisely such communications as he says he desired to make with his hoisted signals.

There is a signal calling for a tug. and there is a signal requesting to be reported by telegraph to the owner. He did not hoist either of these signals, but hoisted a signal forward, "I want immediate assistance," and another signal aft, "Can you give me assistance in the way of ......?" When asked upon cross-examination why he had the signal flying calling for immediate assistance, if he did not want immediate assistance, his reply was that he hoisted that signal when he was on the Vancouver shore. He says:

"I was heading right for the beach at that time. The vessel was going right into the Vancouver shore, and I could not get the vessel around at that time, and I would have taken anything because I was in danger then."

But the schooner was in the same dangerous situation on the American shore, and, later, even worse, than on the Vancouver shore. She was without a rudder, and had a list of 9 degrees to port. She was unmanageable as against wind and current. She was nearing a rocky shore. Waaddah Island was a mile directly to the west. The Weather Bureau at Tatoosh Island reports that the wind from 4 p. m. to 11 p. m. was from the northeast. High water on that evening at Neah Bay, immediately to the west of Waaddah Island, was at 6:58. Tide Tables of the Pacific Coast by the Coast and Geodetic Survey, 1907. After 7 o'clock the tide would ebb towards the entrance of the strait, and with the added force of the wind there would have been imminent danger that the schooner would have been carried either immediately ashore, or upon Waaddah Island, or upon the rocks at the entrance of the strait. "The ebb current is felt most along the southern shore of the strait." United States Coast Pilot, Pacific Coast (2d Ed.) Juan de Fuca Strait, p. 135. It is idle to say that in this situation the schooner was not in distress, and that she was not in danger. She was in great danger, and very properly had signals of distress flying all that day, and at the time she was rescued. But the master testified that he could have anchored where he was. The weight of evidence is that the ground at this point is rocky, and anchorage insecure, and particularly so with what is called "patent anchors," with which the schooner was equipped. We do not think that, in the state of the weather and tide, the schooner had any security in her anchors at the place she was when she was taken in tow by the Nelson.

The conflicting testimony relating to the conversation between the two captains when the towage service began, as to whether the service to be rendered was to be a towage or a salvage service, is immaterial. The master admitted that the Nelson came to the Holden in response to the signals calling for immediate assistance, and that the captain of the Nelson asked, "What do you want?" The subsequent conversation between the two captains about towage establishes at least one fact beyond question—the commendable purpose of the master of the Nelson to do his duty in a dangerous situation to a disabled vessel. But the claim that the service was to be a towage service is contradicted by the conduct of the master of the Holden. He said he asked the master of the Nelson, "Can you tow me to Port Townsend?" He afterwards asked, "How much do you want to tow me to Port Townsend?" When, on the morning of December 13th, the two vessels were rounding Ediz

Hook at the entrance to the harbor at Port Angeles, and the 10-inch hawser had parted for the third time, the captain of the Holden was disinclined to take the Nelson's hawser again, and said to the captain of the Nelson that he was in smooth water and in no danger, intimating that the services of the Nelson were no longer required. He, however, took the hawser, and was towed into Port Angeles, where he anchored. When asked by the captain of the Nelson if he was safe, he said he was, and that he had ordered two boats to take him to Port Townsend. This port was 30 miles to the east of Port Angeles. If the master of the Holden had entered into an agreement with the master of the Nelson to be towed to Port Townsend, why did he not insist upon the fulfillment of the agreement, and why did he order two boats to take him on to Port Townsend? It is apparent from the evidence that there was no such agreement with the captain of the Nelson. It was a service voluntarily rendered to a vessel needing assistance, and was designed to relieve her from distress, caused by her disabled condition and the state of the weather and tide. She was in the presence of danger, and further danger was reasonably to be apprehended.

The Nelson was not engaged in the towing business, and the service she rendered was not for the mere purpose of expediting the Holden on her voyage. She was not on her voyage. She was seeking a place of safety. The service rendered was prompt, efficient, and successful, causing delay, inconvenience, and danger to the Nelson. The difficulties and dangers encountered during the night in towing the schooner to a place of safety are sufficient to show the value of the service rendered, and justified the court in its award. Under the circumstances, the decree made by the District Court in favor of the Nelson, her officers, and crew appears to be reasonable and just.

The decree of the District Court is therefore affirmed.