## THE FAIR OAKS.

### (District Court, W. D. Washington, S. D.   May 10, 1913.)

### No. 730.

SALVAGE (§ 30*)—COMPENSATION—RESCUE OF DISABLED STEAMER.

   A steamer, worth with her cargo of lumber nearly $50,000, after being salved, which struck on the bar at the entrance to Grays Harbor, disabling her rudder and causing her to leak so as to put out her fires, *held*, on the evidence, to have been in a situation of great peril, with serious danger of loss of life, owing to the tide and high wind, when she was rescued by libelant's tug and towed to a port, which was reached three days later, and libelant and the officers and crew of the tug given a salvage award of $8,000.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74;  Dec. Dig. § 30.*]

In Admiralty.   Suit for salvage by the Grays Harbor Tugboat Company against the steamer Fair Oaks; Thomas Pollard, claimant.   Decree for libelant.

James M. Ashton and Huffer, Hayden & Hamilton, all of Tacoma, Wash., for libelant.

Ira A. Campbell, of San Francisco, Cal., for claimant.

CUSHMAN, District Judge.   This suit is one for salvage.   On the 25th of August, 1909, the libelant salved the Fair Oaks, after she had become disabled by striking in going over the bar at Grays Harbor, outward bound to San Francisco.

The answer admits and alleges:   That at the time the assistance was rendered the fires of the Fair Oaks had been put out by the water rising in the hold, within 25 minutes after striking.   That part of her deck load had been jettisoned.   Some of her seams had opened.   She struck on the bar four or five times.   The first time she struck, her rudder was put out of commission.   A strong current was running to the northwest across the bar.   As the water rose in the hold, she twice listed, once to the starboard and once to the port, and that to right the vessel on each occasion the lashings on the deck load were let go and a large part of her cargo jettisoned.   That she gave the danger signal upon the appearance of libelant's tug, the John Cudahy.   That ten minutes later a line was got aboard from the tug and she was towed into Willapa Harbor.

Claimant denies that the Fair Oaks was worth, when moored at Willapa Harbor, more than $30,000, or her cargo more than $1,800. The controversy has narrowed to the nature of the services rendered, as depending upon the value of the property imperiled and the extent of the danger to which the vessels and crews were exposed.

Besides the testimony of those aboard the salving and salved vessels, evidence was given by the captain and others aboard the United States steamship Yorktown, lying off the bar at the time the Fair Oaks struck and about a mile away.   The testimony is of a very contradictory character, so far as the location of the Fair Oaks at the

time the line was put on board her, is concerned. Libelant's contention is that the Fair Oaks had not got over the bar; that the wind and current were carrying her, in a disabled condition, upon the "north spit," where she would have been inevitably lost, with the crew and the captain's wife, who was also aboard, a total of 19 persons. Claimant contends that the Fair Oaks had passed over the bar and was in comparative safety, though her fires were out; that she, being a wooden vessel loaded with lumber, was in no danger of sinking, and could have saved herself with her sails and anchors.

Libelant relies upon the following authorities: The City of Puebla (D. C.) 153 Fed. 925; The Edith L. Allen (D. C.) 139 Fed. 888; Perriam v. Pacific Coast Co., 133 Fed. 140, 66 C. C. A. 206; The Pinmore (D. C.) 121 Fed. 424; The Sir Robert Fernie (D. C.) 96 Fed. 348; The T. F. Oakes (D. C.) 87 Fed. 229; The Elfrida, 77 Fed. 754, 23 C. C. A. 527; The North Erin (D. C.) 71 Fed. 430; The Amity, 69 Fed. 110, 16 C. C. A. 170; The Charles Wetmore (D. C.) 51 Fed. 449; The Luckenbach v. Scows 3 and 16 (D. C.) 50 Fed. 570; The Agnes I. Grace (D. C.) 49 Fed. 662; The Jessomene (D. C.) 47 Fed. 903; The Don Carlos (D. C.) 47 Fed. 746; Walsh v. Scows 6, 16, and 24 (D. C.) 45 Fed. 901; The Tancarville (D. C.) 45 Fed. 903; The Albany (D. C.) 42 Fed. 65; The Erin (D. C.) 36 Fed. 712; The Maggie Willett (D. C.) 27 Fed. 519; Queen of the Pacific (C. C.) 25 Fed. 610; The Lahaina (D. C.) 19 Fed. 923; The Gibson (D. C.) 160 Fed. 230; Johnson v. The Industry, Fed. Cas. No. 7,391; Adams v. Island City, Fed. Cas. No. 55; The Euphrasia, Fed. Cas. No. 4,545; The Lexington, Fed. Cas. No. 8,336; The South Bay (D. C.) 139 Fed. 273; The Grace Dollar (D. C.) 103 Fed. 665; The Willis A. Holden, 174 Fed. 5, 98 C. C. A. 43; Earn Line S. S. Co. v. United States (C. C.) 170 Fed. 834; The Benjamin A. Van Brunt (D. C.) 164 Fed. 775.

The claimant cites certain of the authorities enumerated above, and, in addition, the following: The Sirius v. Cedros Island M. & M. Co., 57 Fed. 851, 6 C. C. A. 614; Weir v. Price, 69 Fed. 104, 16 C. C. A. 164; Pacific Mail S. S. Co. v. Commercial Pacific Cable Co., 173 Fed. 28, 97 C. C. A. 346; The Loch Garve, 182 Fed. 519, 105 C. C. A. 57; The Monticello (D. C.) 81 Fed. 211; Spreckles v. The Brussels (D. C.) 38 Fed. 524; The City of Puebla (D. C.) 153 Fed. 925; Puget Sound Tugboat Co. v. City of Puebla (D. C.) 79 Fed. 982.

Nothing can be gained by any extended statement or analysis of the conflicting testimony. On account of the lack of interest of the witnesses on the Yorktown, and the fact that they were not so busily engaged as those upon the Fair Oaks and Cudahy, their testimony controls the court's finding where there is a substantial dispute.

The Fair Oaks drew over 18 feet of water. The Cudahy drew 12 feet. The government charts show the water at this point 12 to 14 feet "at the mean of the lower low waters." The Fair Oaks was going out over the bar on ebb tide, about an hour before low tide.

The preponderance of the evidence shows that the Fair Oaks had not cleared the bar when she was picked up by the Cudahy. The distance across the bar, the speed she was making, retarded by her sink-

ing down into the water as she filled, the stopping of her engines and bumping on the bar, her maneuvers, the soundings taken, her distress whistles and other circumstances, as well as the testimony of the witnesses locating her with reference to the buoys, marking the channel and bar, show this.

If she were clear of the bar, her danger, though not so imminent, was but little less. The "north spit," with 11 feet of water, was only a few hundred feet away. The wind, which was 35 or 40 miles an hour, was blowing along the line of the outer boundary of the bar. The current was substantially in the same direction.

The captain of the Yorktown is not certain in his opinion whether, if unassisted, the Fair Oaks would have gone on the shoals at the mouth of Grays Harbor, or further up the coast. The inference from his testimony is fair that, in his opinion, there were no other reasonable alternatives than those two. If she had gone on either of these shoals, she would have broken up. On account of the strength of the wind and current and the nature of the bottom, there is no probability that her anchors would have held; also, on account of the wind and current, in her disabled condition, there is no probability that her sails could have been used with any effect in time to have saved her. With her deck load, she would probably have capsized. It is therefore found that the danger to the Fair Oaks was great and imminent. The coast at this point is notoriously dangerous. The Pinmore (D. C.) 121 Fed. 423.

There were eight persons aboard the Cudahy, including the officers, crew, and a pilot for the Yorktown. Though the danger to the Cudahy, and those aboard, in her work of rescue, was not great, it was considerable, as the sea was covered with the jettisoned lumber from the Fair Oaks, from which she might have been stove in, or her propeller disabled. If the latter had been put out of commission, she, too, would have gone on the shoals. A high degree of skill was shown by those aboard the Cudahy in the prompt assistance rendered.

There was serious danger of loss of life to those aboard the Fair Oaks, although it cannot be said that there was serious danger of great loss of life. The nearest land was two or three miles away.

It was about noon when the Fair Oaks struck. Although there had been fog in the morning, and there was fog later on, yet at this time it was clear. The Yorktown stood in close by, prepared to lower lifeboats; the water being too shoal for her to aid the Fair Oaks. The boats of the Fair Oaks were also available. Though the water was rough and the lifeboats could not have gone among the shoals, where the water was breaking, yet they could probably have taken those aboard off the Fair Oaks before she drifted on the shoals. The danger of the lifeboats being stove in or capsized in making the Fair Oaks, on account of the floating timbers and the rough water, with the difficulty of keeping off the shoals on account of the wind and current, would have been the chief dangers.

The evidence as to the value of the Fair Oaks has ranged from $30,000, admitted in the answer, to $90,000. She was appraised in May, 1909, at $65,000. Her value is found to have been $60,000, less

$13,589.44, the amount of repairs necessary to restore her, or $46,-410.56, when moored at Willapa Harbor. The value of her cargo is found to have been $3,855.55, less $1,097, freight, or $2,758.55. The value of the Cudahy is found to have been $35,000.

The Cudahy was from noon on the 25th to the forenoon of the 28th of August in getting the Fair Oaks into Willapa Harbor. During this time these two boats were trailed by two other tugs belonging to the libelant, this being done for the purpose of rendering assistance, if the same should be necessary, during which time, one of these, the Traveler, helped put another line on the Fair Oaks.

The complaint is made in the answer that the Cudahy grounded the Fair Oaks in Willapa Harbor before her mooring. This complaint is not justified by the evidence.

In consideration of the character of the salvage service rendered, its meritorious and high rank, above pointed out, the following amounts are allowed: Eight thousand dollars, $800 of which is to be divided among the officers and crew of the Cudahy, in the proportion of the amount of their monthly pay. For taking depositions at San Francisco, an attorney's fee of $400 is allowed. On the $8,000 above awarded, interest is allowed at the legal rate from September 4, 1909, the date of filing the libel.