# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 7, 2017   Decided May 30, 2017

No. 16-7070

DEMETRA BAYLOR,
APPELLANT

v.

MITCHELL RUBENSTEIN & ASSOCIATES, P.C.,
APPELLEE

Consolidated with 16-7071

On Appeals from the United States District Court
for the District of Columbia
(No. 1:13-cv-01995)

*Radi Dennis* argued the cause and filed the briefs for appellant/cross-appellee.

*Ronald S. Canter* argued the cause and filed the briefs for appellee/cross-appellant.

Before: HENDERSON, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

EDWARDS, *Senior Circuit Judge*: In order to pursue a Master's degree in Computer Graphics, Demetra Baylor ("Appellant") took out six student loans. Several years after her graduation, Mitchell Rubenstein & Associates, P.C. ("Appellee") came calling to collect. At the heart of this case are a number of inconsistencies in letters that Appellee sent Appellant over the course of several months regarding her loans and the amounts that she owed on them, as well as Appellee's failure to direct all of its communications to Appellant's attorney after she retained counsel. In response, Appellant filed suit on December 17, 2013, alleging that Appellee had violated the Fair Debt Collection Practices Act ("FDCPA"), the District of Columbia Consumer Protections Procedures Act ("CPPA"), and the District of Columbia Debt Collection Law ("DCDCL"), statutes which target abusive debt collection and improper trade practices. *See* 15 U.S.C. § 1692(e); D.C. CODE §§ 28-3904, -3814.

Over the course of the next few years, the parties engaged in what the District Court termed a "particularly striking expenditure of effort and resources," generating "excessive, repetitive, and unnecessarily sharp pleadings." Order, Dkt. No. 41, at 2. Nonetheless, all of Appellant's statutory claims were eventually resolved. Appellant accepted Appellee's offer of judgment regarding her FDCPA claim and the District Court, with the aid of a Magistrate Judge, determined the attorney's fees to which she was entitled for this success. Appellee, meanwhile, prevailed in its Motion to Dismiss all of Appellant's CPPA claims and some of her DCDCL claims, the remainder of which were rejected when the District Court subsequently granted Appellee's Motion for Summary Judgment.

A number of orders from this "clutter[ed]…docket" are challenged on appeal. *Id*. *First*, the parties dispute the District Court's decision to adopt a Magistrate Judge's recommendation that Appellant receive approximately twenty percent of the attorney's fees that she requested. *Second*, Appellant asserts that the District Court erred in finding that Appellee's conduct does not fall within the aegis of the CPPA. *Third*, Appellant also contends that the District Court abused its discretion in failing to credit her objections to a different Magistrate Judge's denial of her Motion to Compel the disclosure of communications between Appellee and an agent of Appellant's creditor on the grounds that these documents were protected by attorney-client privilege. Appellant additionally disputes the District Court's refusal to award her attorney's fees for her efforts in litigating this issue. *Finally*, Appellant argues that the District Court improperly granted Appellee's Motion for Summary Judgment on her DCDCL claims. On this last point, Appellant contends that the District Court failed to appropriately account for evidence demonstrating that Appellee had "willfully violated" the DCDCL and was therefore subject to liability under the statute.

We do not reach the question of whether the District Court abused its discretion in awarding Appellant only a percentage of the attorney's fees she sought in connection with her FDCPA claim. In addressing this issue, the District Court relied on the standard set forth in Local Civil Rule 72.2 in finding that the Magistrate Judge's proposed disposition was not "clearly erroneous or contrary to law." This was error. Federal Rules of Civil Procedure 54(d)(2)(D) and 72(b)(3) foreclose the District Court from using a "clearly erroneous or contrary to law" standard when evaluating a Magistrate Judge's proposed disposition of a fee request. The correct standard of review is *de novo*. We therefore reverse and remand to allow the trial judge to reconsider this matter in the first instance applying *de*

*novo* review to assess the Magistrate Judge's recommendation. We affirm all of the remaining Orders challenged on appeal.

## I. BACKGROUND

On February 21, 2013, Appellee, a law firm whose primary focus is the recovery of consumer debts, sent the first of several letters to Appellant notifying her that her account, which had been assigned file number R80465, "ha[d] been referred to [its] office for collection." Complaint, Dkt. No. 1, Ex. E; *see* Answer, Dkt. No. 28, at 2. It listed the creditor for her debt as Arrowood Indemnity Company and stated that she currently owed $26,471.07, though cautioned that, "[b]ecause of interest, late charges and other charges that may vary from day to day, the amount due on the day you pay may be greater." Complaint, Dkt. No. 1, Ex. E. Following a request for more information regarding both the ownership and amount of this debt from Appellant, Appellee sent a second letter. It provided a new total for the amount that Appellant owed, $31,268, a slight reformulation of the name of Appellant's creditor, Arrowood Indemnity Company/Tuition Guard, and identified her original creditor as Citibank (South Dakota) N.A. Complaint, Dkt. No. 1, Ex. D; *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 55 F. Supp. 3d 43, 46 (D.D.C. 2014).

Appellant retained counsel, who contacted Appellee regarding the provenance of this debt and advised that any "future communication regarding this matter should be directed to [her] firm" rather than to Appellant. Complaint, Dkt. No. 1, Ex. B. The parties then entered into settlement negotiations, during which Appellant informed Appellee that she had additional outstanding loans not referenced in its second letter. Appellee's client referred these new loans to Appellee so that Appellant could settle all of her debt at once. *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 174 F.

Supp. 3d 146, 150 (D.D.C. 2016); Appellee's Statement of Undisputed Facts, Dkt. No. 96 ⁋⁋ 12–13. On August 22, 2013, Appellee sent another letter to Appellant's home, albeit addressed to her attorney, regarding this second set of loans. Complaint, Dkt. No. 1, Ex. A. It provided a new file number for this debt, R83798, which totaled $27,459.48, and noted that her creditor was Tuitionguard Arrowood Indemnity. *Id.* After Appellant's counsel requested additional information regarding these loans, Appellee stated that Appellant owed "$27,459.48 plus interest from 10/21/11 at the rate of 3.75% until paid" and listed Tuitionguard/Arrowood Indemnity and Student Loan Corp. as the creditor and original creditor, respectively, of this debt. Complaint, Dkt. No. 1, Ex. C.

On December 17, 2013, Appellant filed suit in the District Court. She claimed that the inconsistencies in the communications she had received from Appellee, including, most notably, the variance in the "character and amount" of Appellant's alleged debt and the creditors associated with these loans, as well as Appellee's failure to direct all of its communications to Appellant's counsel after she had retained legal representation, constituted violations of both the FDCPA and CPPA. Complaint, Joint Appendix ("JA") 26–28, 31–33. She also asserted that these actions were proof that Appellee had both violated various provisions of the DCDCL and "knowingly maintained policies, practices and procedures that were intentionally and willfully inadequate" to meet its obligations under this statute. *Id.* at 29–31.

Appellee moved to dismiss the Complaint. However, while this motion was pending, Appellee extended, and Appellant accepted, an offer of judgment regarding her FDCPA claims. *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 77 F. Supp. 3d 113, 115 (D.D.C. 2015). A judgment was then entered "in the amount of $1,001.00 plus costs and

expenses together with reasonable attorney fees for all claims under the [FDCPA]" by the Clerk of Court. *Id.* Appellant thereafter filed a motion seeking $155,700 in attorney's fees for 346 hours of work at a rate of $450 an hour. *Id.* She was later permitted to amend her requested fees due to subsequent filings in this case. *Id.* at 115–16.

The District Court referred this request to a Magistrate Judge pursuant to Local Civil Rule 72.2. After reviewing the matter, the Magistrate Judge recommended that the hours included in Appellant's initial fee request be reduced by 85% because they were significantly higher than reasonable. *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 2014 WL 7014280, at *4 (D.D.C. Oct. 24, 2014). She found that certain tasks were not eligible for attorney's fees under the statute; some of the hours requested were expended on Appellant's unsuccessful state law claims or occurred after Appellant had already accepted Appellee's offer of judgment; and Appellant's counsel had failed to "heed the Court's admonition" to moderate the tenor of her filings. *Id.* at *4–5. The Magistrate Judge also determined that a 50% reduction should be applied to Appellant's additional request for fees because Appellant had "again engaged in the tactics against which the Court cautioned, thus expending considerable unproductive activity." *Id.* at *5. The District Court reviewed the Magistrate Judge's Report and Recommendation to determine if it was "clearly erroneous or contrary to law" and, after determining that it was not, adopted it in its entirety. *Baylor*, 77 F. Supp. 3d at 124.

In July 2014, the District Court granted Appellee's Motion to Dismiss all of Appellant's claims under the CPPA and some of her DCDCL claims. Following a contentious discovery process, in which the District Court affirmed a Magistrate Judge's Memorandum Opinion granting in part and denying in part Appellant's Motion to Compel production of certain

communications between Appellee and an agent of its client, Appellant's creditor, Appellee filed a Motion for Summary Judgment and Appellant filed a cross-Motion for Partial Summary Judgment. The District Court granted the former and denied the latter.

## II.  ANALYSIS

### A.  *Standard of Review*

This court reviews *de novo* the District Court's decision to grant a motion to dismiss or motion for summary judgment and the "legal question" of whether it "improperly applied [a local rule] in place of the standards prescribed by [the Federal Rules of Civil Procedure]." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016); *see Nat'l Wildlife Fed'n v. Browner*, 127 F.3d 1126, 1128 (D.C. Cir. 1997). We will, however, generally review discovery orders only for abuse of discretion, unless the District Court applied the wrong legal standard. *United States v. Deloitte LLP*, 610 F.3d 129, 134 (D.C. Cir. 2010).

### B.  *Appellant's Fee Request*

Local Civil Rule 72.2(a) permits the District Court to refer "any pretrial motion or matter," with the exception of certain motions and petitions set forth in Local Civil Rule 72.3, to a Magistrate Judge. If any party files written objections to a Magistrate Judge's ruling on such a matter, the District Court "may modify or set aside any portion of [the] order … found to be clearly erroneous or contrary to law." Local Civil Rule 72.2(c). Because Local Civil Rule 72.3 makes no specific mention of motions for attorney's fees, the District Court assumed that a Magistrate Judge's recommendation on a fee

award could be reviewed according to the deferential "clearly erroneous or contrary to law" standard. This was error.

Federal Rule of Civil Procedure 54(d)(2)(D) states that a court "may refer a motion for attorney's fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter," a process which requires that a district judge "determine de novo any part of the magistrate judge's disposition that has been properly objected to," FED. R. CIV. P. 72(b)(3). The permissive language of Rule 54(d)(2)(D), specifically its use of the word "may," appears to have led the District Court to believe that referral via Local Civil Rule 72.2, with its attendant "clearly erroneous or contrary to law" standard of review, provided a legitimate alternative to the *de novo* review standard set forth in Federal Rules of Civil Procedure 54(d)(2)(D) and 72(b)(3). *See Baylor*, 77 F. Supp. 3d at 117 & n.2. This was not an unreasonable mistake, but it was a mistake.

The Federal Magistrates Act permits district courts to draw upon the assistance of Magistrate Judges to resolve "any pretrial matter pending before the court." 28 U.S.C. § 636(b)(1)(A). The power vested in Magistrate Judges to dispose of issues referred to them under this provision depends upon the type of motion at issue. 28 U.S.C. § 636(b)(1)(A) lists eight pretrial motions, including motions for summary judgement and injunctive relief, for which Magistrate Judges may only provide "proposed findings of fact and recommendations for the disposition [of the matter]." *Id.* § 636(b)(1)(B). These recommendations must be reviewed *de novo* by a district court judge if properly objected to by one of the parties. *See id.* § 636(b)(1)(C). For all other pretrial motions, Magistrate Judges are permitted to "hear and determine" the matter, and a district court will only set aside their order where it has been shown that it is "clearly erroneous

or contrary to law." *Id.* § 636(b)(1)(A); *see Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 5–6 (1st Cir. 1999).

This differentiation between the degree of authority a Magistrate Judge is permitted to wield over certain motions, and the standard of review which must be applied to the judge's proposed resolution of such matters, is rooted in "[c]onstitutional concerns," specifically the "possible . . . objection that only an article III judge may ultimately determine the litigation." 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3068.2, p. 367 (3d ed. 2014); *see PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 13 (1st Cir. 2010).

When Rule 72 was promulgated to "implement the legislative mandate of Section 636(b)(1)," it retained § 631(b)(1)'s basic structure – dividing pretrial motions between issues that a Magistrate Judge could determine and those for which the judge could simply provide recommendations for consideration by the district court. 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3068, p. 351 (3d ed. 2014). It adopted a slightly different organizing principle, however. Rather than relying on § 636(b)(1)(A)'s list of eight motions to identify the pretrial matters that a Magistrate Judge could not "determine," Rule 72 distinguished between motions that were "not dispositive of a party's claim or defense" and those that were. FED. R. CIV. P. 72(a)–(b); *see* 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3068.2, p. 366 (3d ed. 2014). Nondispositive matters would be referred to a Magistrate Judge pursuant to Rule 72(a) and a district court would be required to "consider timely objections and modify or set aside any part of [an order issued following such a referral] that [was] clearly erroneous or [was] contrary to law." Dispositive motions, meanwhile, would be referred to a Magistrate Judge via Rule 72(b) and the district court would

be required to "determine de novo any part of [a] magistrate judge's [recommendation] that ha[d] been properly objected to." FED. R. CIV. P. 72(b)(3).

In spite of the legal significance of the distinction between dispositive and nondispositive motions it is not immediately apparent from the text of Rule 72 how, precisely, to determine whether a particular type of motion should be deemed to be "dispositive of a party's claim." While most courts agree that the eight motions set forth in § 636(b)(1)(A) are "dispositive," this list has largely been deemed to be illustrative of the matters that could fall within the scope of Rule 72(b), rather than exhaustive. *See Phinney*, 199 F.3d at 5–6; *Massey v. City of Ferndale*, 7 F.3d 506, 508 (6th Cir. 1993).

Prior to the promulgation of Rule 54(d)(2)(D), therefore, courts lacked any specific guidance regarding whether Magistrate Judges had the authority to provide a determination regarding a request for attorney's fees as if it was a nondispositive motion or were instead permitted only to provide a recommendation regarding the disposition of such matters. Faced with this uncertainty, three circuits held that motions for attorney's fees should be treated as dispositive motions and thus subject to *de novo* review by a district court judge if properly objected to. *See Massey*, 7 F.3d at 509–10; *Estate of Conners by Meredith v. O'Connor*, 6 F.3d 656, 659 (9th Cir. 1993); *Ins. Co. of N. Am. v. Bath*, 968 F.2d 20, 1992 WL 113746, at *2 (10th Cir. 1992) (Order and Judgment). Two of these courts also held that Magistrate Judges lacked the authority to "determine[]" a fee request because it was a "post-dismissal motion[]" and Rule 72, by its terms, applies only to "pretrial matters." *Massey*, 7 F.3d at 510 (quoting *Bennett v. Gen. Caster Serv. of N. Gordon Co.*, 976 F.2d 995, 998 n.5 (6th Cir. 1992)); *see Estate of Conners by Meredith*, 6 F.3d at 659 n.2.

Rule 54(d)(2)(D) thus took effect at a time when it was by no means certain what, if any, authority Magistrate Judges could wield when evaluating motions for attorney's fees and the degree of oversight district courts were required to provide over such matters. Its purpose, as described by the accompanying Advisory Committee Note, was to "eliminate[] any controversy" regarding a court's ability to treat "motions for attorneys' fees . . . as the equivalent of a dispositive pretrial matter that can be referred to a magistrate judge." Advisory Comm. Notes 1993 Amend. The statutory and legal backdrop against which this amendment took place make clear that this Rule was not intended to permit courts to rely upon the standards and procedures associated with dispositive motions *in addition* to those for nondispositive motions. Indeed, providing district courts with the ability to alternate between these different standards would be anathema to the constitutional concerns that underlie the structure of § 636(b)(1) and Rule 72. Rather, Rule 54(d)(2)(D) provided that if a district court wished to refer a motion for attorney's fees to a Magistrate Judge it could do so pursuant to the procedures laid out in Rule 72(b), which include a requirement that the district court review a Magistrate Judge's recommendation regarding a fee award *de novo* if properly objected to. Thus, in context, it is clear that Rule 54(d)(2)(D)'s use of the permissive verb "may" refers to the permissive nature of the district judge's authority to refer the case to a magistrate, with no effect on the standard of review to be applied if the reference is made.

It is no response that Local Civil Rule 72.2 provides an "alternative[]" to Rule 54(d). *Baylor*, 77 F. Supp. 3d at 117 n.2. While Rule 54(d)(2)(D) permits courts to establish by local rule "special procedures to resolve fee-related issues without extensive evidentiary hearings," there is no indication this language was intended to loosen the standard that should be

applied to a Magistrate Judge's recommendation after such hearings have been conducted. Therefore, because district courts may not "circumvent the Federal Rules of Civil Procedure by implementing local rules or 'procedures' which do not afford parties rights that they are afforded under the Federal Rules," we join a number of our sister circuits in requiring that motions for attorney's fees be reviewed *de novo* if referred to a Magistrate Judge and properly objected to. *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 n.4 (D.C. Cir. 1996) (quoting *Brown v. Crawford Cty.*, 960 F.2d 1002, 1008 (11th Cir. 1992)); *see McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005); *ClearOne Commc'ns, Inc. v. Bowers*, 509 F. App'x 798, 804–05 (10th Cir. 2013); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *cf. Rajaratnam v. Moyer*, 47 F.3d 922, 924 & nn.5, 8 (7th Cir. 1995) (finding that motion for attorney's fees referred via 28 U.S.C. § 636(b)(3) required *de novo* review). To the extent that Local Civil Rule 72.2 can be understood to suggest anything to the contrary, it is overruled.

Because we find that the District Court applied the wrong standard when reviewing the Magistrate Judge's Report and Recommendation, we will not reach the parties' claims that the District Court erred in adopting the Magistrate Judge's proposal to award Appellant approximately twenty percent of her requested attorney's fees. Instead, we remand this matter to the District Court so that it can review the Magistrate Judge's Report and Recommendation anew, and *de novo*.

## C. *Appellant's CPPA Claims*

Appellant contends that the District Court erred in dismissing her claim that Appellee's conduct violated the CPPA, which creates an "enforceable right to truthful information from merchants about consumer goods and

services that are or would be purchased, leased, or received in the District of Columbia." D.C. CODE § 28-3901(c). We disagree. "In answering questions involving the proper interpretation of D.C. statutes, [we rely] on the construction of these laws by the D.C. Court of Appeals." *Poole v. Kelly*, 954 F.2d 760, 761 (D.C. Cir. 1992) (per curiam). The D.C. Court of Appeals' precedents and the text of the CPPA itself support the District Court's determination that Appellee's conduct does not fall within the aegis of this law.

One of the principal goals of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices." D.C. CODE § 28-3901(b)(1). To that end, it embraces both an expansive understanding of the conduct which constitutes a "trade practice" – "any act which does or would create, alter, . . . make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale . . . or transfer, of consumer goods or services, which are "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit . . . and consumer services of all types" – and provides an extensive list of unlawful trade practices. D.C. CODE § 28-3901(a)(6)–(7); *see id.* § 28-3904; *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 708 (D.C. 1981). These prohibited practices can only be committed by a merchant, an individual who "sell[s]…or transfer[s], either directly or indirectly, consumer goods or services" or who, in the ordinary course of business, "suppl[ies] the goods or services which are or would be the subject matter of a trade practice." D.C. CODE § 28-3901(a)(3); *see DeBerry v. First Gov't Mortg. & Inv'rs Corp.*, 743 A.2d 699, 701 (D.C. 1999).

There is little question, as Appellant notes, that a merchant who provides a consumer with credit, such as the loans at issue in this case, would fall comfortably within the scope of the

CPPA. *See DeBerry*, 743 A.2d at 701; *cf. Jones v. Dufek*, 830 F.3d 523, 527–28 (D.C. Cir. 2016). Yet, that is not this case. Instead, we are confronted with a situation in which a debt collector, attempting to recoup funds on behalf of a creditor who did not itself provide Appellant with any credit, can be found liable under the CPPA. We tread carefully in analyzing this issue, as the D.C. Court of Appeals has explicitly refrained from addressing a related matter. *See Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1026–27 (D.C. 2013) (abstaining from determining whether "the CPPA applies to the trade practices of a mortgage loan servicer"). However, our interpretation of that court's precedents suggests that Appellee's conduct does not fall within the bounds of this statute.

The CPPA applies only to consumer-merchant relationships. *See Snowder v. District of Columbia*, 949 A.2d 590, 598–600 (D.C. 2008). However, decisions from the D.C. Court of Appeals indicate that a merchant need only be connected with the "supply side" of a consumer transaction for liability to attach. *See Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch., Inc.*, 514 A.2d 1152, 1159 (D.C. 1986) (quoting *Howard*, 432 A.2d at 709). In this case, it appears that there are two ways in which the interactions between Appellant and Appellee might be viewed to come within the compass of this statute.

*First*, Appellant suggests that Appellee is connected to the supply side of the transaction in which Appellant first acquired her student loans. *See* Reply Br. for Appellant at 13. In our view, this argument is based on a strained construction of the statute. It is hard to see Appellee as a culpable party on the supply side of the transaction when we know that there was a merchant who initially provided the consumer credit and then subsequently transferred ownership of this debt after it was in

default to a new creditor who, without providing Appellant with any "goods or services" to speak of, retained Appellee to collect on these loans. In this situation, it seems implausible to characterize Appellee as someone who sold or transferred consumer goods or services or who supplied the goods or services which are or would be the subject matter of a trade practice. *See Osinubepi-Alao v. Plainview Fin. Servs., Ltd.*, 44 F. Supp. 3d 84, 92–93 (D.D.C. 2014) (refusing to apply CPPA to "a licensed attorney [attempting] to collect the debt through litigation" where the attorney was not engaged in the practice of extending credit or selling debt); *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 279–80 (D.D.C. 2011) (refusing to apply CPPA to parties that did not sell or give goods or services to plaintiff).

*Second*, it might be argued that Appellee is a merchant in its own right. Yet, it seems perverse to suggest that the "consumer" of the services it provides – debt collection – is the individual from whom it is attempting to collect rather than the creditor who retained it. The provisions of the CPPA cited in Appellant's Complaint, D.C. CODE § 28-3904(e) and (f), appear to apply only when a *consumer* is, or could be, misled by a merchant's actions. *See id.* ("It shall be a violation of this chapter, whether or not any consumer is in fact misled [or] deceived…for any person to…misrepresent as to a material fact which has a tendency to mislead" or "fail to state a material fact if such failure tends to mislead."). The situation here does not fit within the statutory proscription.

In light of the terms of the statute, we are constrained to hold that Appellee's conduct falls outside the scope of the CPPA. Appellant's arguments to the contrary are unpersuasive. Because we find that Appellee's actions did not take place within the context of a consumer-merchant relationship, as required by the CPPA, we need not address Appellant's claim

that debt collection is a "trade practice" as defined by this statute.

It is also unnecessary for us to address Appellant's claim that the CPPA permits certain individuals or entities to seek remedies for "the use of a trade practice in violation of a law of the District," including the DCDCL. D.C. CODE § 28-3905(k)(1)(A); *see id.* § 28-3909; Br. for Appellant at 55. It is true that "[a]lthough § 28-3904 makes a host of consumer trade practices unlawful . . . [t]he remainder of the statute . . . contemplates that procedures and sanctions provided by the [CPPA] will be used to enforce trade practices made unlawful by other statutes." *Atwater v. D.C. Dep't of Consumer & Regulatory Affairs*, 566 A.2d 462, 466 (D.C. 1989). However, Count III of Appellant's Complaint asserts only that Appellee's actions ran counter to two specific provisions of the CPPA itself, D.C. CODE § 28-3904(e)–(f). Complaint, JA 31–33. It makes no mention of Appellee's alleged violations of any other laws as grounds for recovery under this statute.

For the foregoing reasons, we affirm the District Court's decision to dismiss Appellant's CPPA claims.

## D. *Appellee's Claim of Attorney-Client Privilege*

After the District Court granted in part Appellee's Motion to Dismiss, the parties embarked on an "extremely long and contentious discovery process." *Baylor*, 174 F. Supp. 3d at 151. Further problems arose when Appellant filed a Motion to Compel production of certain communications between Appellee and Sunrise Credit Services, Inc. ("Sunrise"), the organization which retained Appellee to collect Appellant's debt on her creditor's behalf. Appellee refused to produce these documents, claiming that they were protected by attorney-client privilege. *See Baylor v. Mitchell Rubenstein & Assocs.,*

*P.C.*, 130 F. Supp. 3d 326, 328 (D.D.C. 2015). The District Court referred this matter to a Magistrate Judge who found that, because Appellant's creditor, Arrowood Indemnity Company ("Arrowood"), had retained "Sunrise for the limited purpose of finding an attorney to help Arrowood collect [Appellant's] debt," Sunrise had "acted as Arrowood's agent for obtaining legal services." *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 2015 WL 4624090, at *4 (D.D.C. July 31, 2015). The Magistrate Judge, after reviewing the matter, concluded in turn that attorney-client privilege attached to some of the communications that Appellee wished to withhold.

In finding that attorney-client privilege attached to communications between Sunrise and Appellee, the Magistrate Judge looked to both Maryland and D.C. law, and held that both states recognize that attorney-client privilege extends to communications between a client's agent and his attorney. *See id.* at *1–2; *Baylor*, 130 F. Supp. 3d at 330 n.2 (explaining that the court need not resolve a dispute regarding which state's law applied because there were no substantive differences between the two jurisdictions (citing *Cruz v. Am. Airlines*, 356 F.3d 320, 332 (D.C. Cir. 2004))); *see also In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1212 (D.C. Cir. 2004) (noting that when an individual asserts "state claims," such as the DCDCL claims at issue here, "state privilege law applies"). We need not address this determination because Appellant does not contest it on appeal.

The arguments advanced by Appellant before this court speak only to the questions of: (1) whether Appellee provided "record evidence" in support of its claims regarding the nature of the relationships between Appellee, Sunrise and Arrowood, Br. for Appellant at 65; and (2) whether two cases, *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 718 A.2d 1129 (Md. 1998) and *J.H. Marshall & Associates., Inc. v. Burleson*, 313

A.2d 587 (D.C. 1973), preclude this court from holding that attorney-client privilege could attach to the communications at issue. We find that the District Court did not abuse its discretion in resolving these issues. We are also unpersuaded by Appellant's claim that the District Court abused its discretion in refusing to award her attorney's fees for her efforts in relation to this matter.

The District Court properly found that Appellee had "proffered adequate evidence" to support its assertion that Sunrise served as Arrowood's agent and an attorney-client relationship existed between Appellee and Arrowood. *See Baylor*, 130 F. Supp. 3d at 331; *id.* at 330 (noting that "[a]t bottom, most of [Appellant's] objections boil down to her claim that [Appellee] failed to offer evidence sufficient to show an agency relationship between Arrowood and Sunrise"). Appellee offered an affidavit describing the relationship between Arrowood and Sunrise and two "authorizations by Arrowood for Sunrise to retain counsel." *See id.* at 331; Appellee's Opposition to Appellant's Motion to Compel, Dkt. No. 72-2, Ex. 4, at 41–42; Dkt. No. 72-3, Ex. 4, at 64–65; Dkt. No. 73-4, Ex. 5, at ¶¶ 4–5. Although the affidavit is spare, we cannot say that the District Court abused its discretion in holding that the Magistrate Judge's determination that this evidence sufficed to support a finding of attorney-client privilege was not clearly erroneous or contrary to law.

Appellant raises two additional arguments to suggest that attorney-client privilege cannot attach to the disputed communications. *First*, she contends that attorneys engaged in the business of debt collection cannot invoke this privilege. Br. for Appellant at 64 (citing *E.I. du Pont*, 718 A.2d 1129). The precedent she cites in support of this claim, *E.I. du Pont*, is distinguishable from the instant case. In *E.I. du Pont*, the court held that the privilege did not apply to communications

between a corporation and a "non-lawyer collection agency" where the corporation had hired this agency only "for the typical business purpose of collecting a debt" even though the agency had subsequently hired an attorney to "litigate the debt collection matter after [the agency's] efforts [to collect on the debt] proved unsuccessful." 718 A.2d at 1141–42. It justified this decision by noting that the agency "may certainly have been [the corporation's] agent for the business purpose of collecting [a] debt" but it was "*not* hired as an agent for purposes of litigation." *Id.* at 1142. Here, however, the Magistrate Judge specifically found that Sunrise was hired only for "the limited purpose of finding an attorney to help Arrowood collect [Appellant's] debt" and never itself attempted to undertake "direct collection actions" against Appellant. *Baylor*, 2015 WL 4624090, at *3–4. We find that the District Court properly held that the Magistrate Judge was not clearly erroneous in determining that this precedent did not preclude Appellee from claiming that certain of its communications with Sunrise were covered by attorney-client privilege. *See Baylor*, 130 F. Supp. 3d. at 334–35.

*Second*, Appellant asserts that Sunrise's actions constitute the unauthorized practice of law and, as such, attorney-client privilege cannot attach to its communications. In support of this claim, Appellant draws upon *J.H. Marshall*, in which the D.C. Court of Appeals held that a collection agency that filed suit to collect on a debt assigned to it by a creditor had engaged in the unauthorized practice of law. 313 A.2d at 590–91. Central to the D.C. Court of Appeals' reasoning in that case was its belief that a collection agency could not "interpose itself between a creditor and an attorney seeking to collect the creditor's claim," *id.* at 595, and a concern that the collection agency in *J.H. Marshall* was "sell[ing] the services of a lawyer, whom it controls and directs, thereby destroying the privity between attorney and client," *id.* at 597. However here the Magistrate

Judge specifically held that Sunrise served only to find "an attorney to help Arrowood collect [Appellant's] debt." *Baylor*, 2015 WL 4624090, at \*4. The Magistrate Judge made no findings that Sunrise ever attempted to collect on Appellant's debt on its own or otherwise serve as anything other than an "intermediary between Arrowood and [Appellee]." *Id.* at \*3. In the absence of additional findings suggesting that Sunrise controlled and directed Appellee's conduct, we hold that the District Court did not abuse its discretion in affirming the Magistrate Judge's determination that Sunrise did not engage in the unauthorized practice of law.

Finally, Appellant claims that the District Court abused its discretion in refusing to award her attorney's fees relating to her Motion to Compel production of communications between Appellee and Sunrise. However, this motion was only partially successful, and Federal Rule of Civil Procedure 37(a)(5)(C) vests the District Court with discretion to "apportion . . . reasonable expenses," if such a motion is "granted in part and denied in part," as it was here. *See* Order, JA 185. We see no abuse of discretion in the District Court's determination that Appellant's limited success and "unduly contentious and overly lengthy pleadings" did not entitle her to attorney's fees and costs. *Baylor*, 130 F. Supp. 3d at 337.

### E. *Appellant's DCDCL Claims*

In her Complaint, Appellant asserted that Appellee's conduct had violated a variety of provisions of the DCDCL, a statute which prohibits creditors and debt collectors from engaging in certain activities such as "collect[ing] any money . . . by means of threat [or] coercion." D.C. CODE § 28-3814(c); *see* Complaint, JA 29–31. Only two of these claims survived Appellee's Motion to Dismiss: (1) Appellant's contention that Appellee misrepresented the amount that she owed in its

various letters to her, and (2) her argument that Appellee improperly contacted her after she retained counsel. *See Baylor*, 55 F. Supp. 3d at 49–53. Following a protracted discovery process, the District Court granted Appellee's Motion for Summary Judgment and denied Appellant's Motion for Partial Summary Judgment regarding these claims. We affirm this decision.

A creditor or debt collector is subject to liability under the DCDCL only when a claimant offers substantial evidence to prove a "willful violation" of the law. *See* D.C. CODE § 28-3814(j)(1). We note, as the District Court did in the proceeding below, that neither this court nor the D.C. Court of Appeals appears to have set forth the standard for determining what constitutes "willful" conduct. While we can find no fault in the District Court's decision to treat this term as embracing "not only knowing violations of [the DCDCL], but reckless ones as well," we refrain, out of deference to the D.C. Court of Appeals, from specifically adopting this standard when interpreting this statute. *Baylor*, 174 F. Supp. 3d at 153 (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). Instead, we note simply that no definition of willfulness advanced by any party in this litigation suggests that Appellee's conduct can be viewed as a "willful" violation of this law. *See id.* at 153 n.5 (summarizing definitions of "willfulness" advanced by Appellant in the proceeding below, including her claim that this standard is satisfied if Appellee "knowingly and intentionally committed an act in conscious disregard for the rights of others" or violates the statute "voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements"); Br. for Appellee at 15 (adopting District Court's interpretation of willfulness).

In reviewing Appellant's contention that the District Court erred in granting Appellee's Motion for Summary Judgment

and denying her Partial Motion for Summary Judgment, this court must determine whether a genuine dispute as to any material fact exists when "viewing the evidence in the light most favorable to the non-movant." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). We are cognizant that where, as here, we consider cross-motions for summary judgment, we must accord both parties the solicitude owed non-movants. Nevertheless, in this case, in order to resolve the parties' disputes over the DCDCL claims, it will suffice for us to address Appellant's claims in order and assess the evidence in the light most favorable to her. As we explain below, even on these terms, Appellant's claims fail.

1. D.C. CODE § 28-3814(g)(5): Appellee's Contact With Appellant After She Retained Counsel

Section 28-3814(g)(5) of the DCDCL bars "debt collector[s] . . . [from using] unfair or unconscionable means to collect or attempt to collect on any claim . . . [by communicating] with a consumer whenever it appears that the consumer has notified the creditor that he is represented by an attorney and the attorney's name and address are known." Neither party disputes the fact that Appellant received a letter from Appellee after her counsel had informed it to cease contacting Appellant directly. Appellee, however, notes that this letter was addressed to Appellant's counsel, and attributes its appearance at Appellant's doorstep to a "computer error." Declaration of Mitchell Rubenstein, JA 508. In an affidavit attached to Appellee's Motion for Summary Judgment, its president explained that Appellee's computer system had merely "failed to update the address on the letter to reflect [Appellant's counsel's] mailing address." *Id.*

Appellant, meanwhile, argues that Appellee lacked "procedures reasonably calculated to avoid [this] error" and

claims that Appellant's explanation for its failure to direct all of its communications to Appellant's counsel in its Motion for Summary Judgment differs from that proffered in its Motion to Dismiss. Appellant's Opposition to Appellee's Motion for Summary Judgment, Dkt. No. 90, at 5; *see* Br. for Appellant at 58. Yet, the record contains evidence that Appellee did, in fact, have procedures which explicitly barred its staff from "contact[ing] or respond[ing] to a consumer if the consumer is represented by counsel." *Baylor*, 174 F. Supp. 3d at 159. Furthermore, as the District Court noted, there is no reason why Appellee cannot offer "an alternative explanation for its conduct" at summary judgment. *See id.* at 158–59 n.9. Because Appellee's assertion that the letter was mistakenly sent to Appellant's home due to a computer error is not controverted by anything in the record, we find that, even assessing the evidence in the light most favorable to Appellant, she has failed to raise a genuine question of material fact as to whether Appellee violated § 28-3814(g)(5) of the DCDCL. *See Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (noting that a court "may not . . . believe one witness over another . . . [but] if one party presents relevant evidence that another party does not call into question factually, the court must accept the uncontroverted fact").

2. D.C. CODE § 28-3814(f)(5): Appellee's Misrepresentations Regarding the Amount that Appellant Owed

D.C. CODE § 28-3814(f)(5) provides that a debt collector may not "use any fraudulent, deceptive, or misleading representation or means to collect or attempt to collect claims . . . [via] any false representation or implication of the character, extent, or amount of a claim against a consumer." There is no question that Appellee provided different figures for the amount that Appellant owed on her first and second set

of loans in its various letters to her. However, Appellee's president avers that these errors were due to its reliance on Sunrise's representation of the "amount forwarded" for collection from Arrowood. Declaration of Mitchell Rubenstein, JA 506. He stated that during Appellee's fifteen year "relationship with Sunrise . . . . [he had] found that the 'amount referred' listed in [its] referral form to be [an] accurate statement as to the present balance owed on [an individual's] debt" and that Appellee had not "knowingly failed to include accrued interest" in its February 21 and August 22, 2013 letters "or otherwise misstate the amount" Appellant owed. *Id.* at 506–508.

In response, Appellant puts forth a slew of claims regarding the training Appellee's employees received and the roles which non-attorneys perform in attempting to collect on various debts. *See* Memorandum in Support of Appellant's Motion for Partial Summary Judgment, Dkt. No. 91-1, at 2–6; Opposition to Appellee's Motion for Summary Judgment, Dkt. No. 90, at 5–7; Reply to Opposition to Motion for Partial Summary Judgment, Dkt. No. 103, at 4–16. Only two appear to be relevant to the specific question of whether Appellee willfully misrepresented the amount that Appellant owed: (1) Appellant's claim that Appellee failed to "maintain or implement any practices or procedures to prevent its employees and managing partner from demanding inaccurate amounts in its demand letters" and lacks "*any* procedures relating to the DCDCL," Dkt. No. 103, at 4; *see* Br. for Appellant at 56; and (2) her argument that a conversation between Appellee and Sunrise, in which Appellee asked if it was possible to "make things simple" by applying an interest rate of 3.75% from the date of Appellant's last payment to her debt after Sunrise had informed Appellee the loans had been "accruing interest at 4% since placement," demonstrated that Appellee permitted its employees to falsify the amount of debt owed by the

individuals it sent collection letters to. Collection Notes, JA 489–90; Br. for Appellant at 58–59.

The first of these arguments is easily set aside. As the District Court noted, Appellee maintains policies and procedures which state that "[p]rior to the issuance and mailing of any demand letter, a firm attorney must review the file to ensure that . . . [t]he claim amount matches the amount the creditor claims is owed." *Baylor*, 174 F. Supp. 3d at 157. Nothing in the record indicates that an attorney did not review the demand letters sent to Appellant, or that more specific policies are required to ensure that the firm's policies are in step with the requirements of the DCDCL.

Appellant's claim that the conversation between Appellee and Sunrise regarding the correct interest rate to be applied surely does not suffice to demonstrate that Appellee *willfully misrepresented* the amount that Appellant owed. Even assessing this evidence in the light most favorable to Appellant, what she offers by way of argument is not enough to show a willful violation of the law. Indeed, if anything, the interaction appears to demonstrate that Appellee was attempting to bring the interest rate it would relay to Appellant in line with the information it had been provided regarding this debt, rather than conjure an interest rate "on a whim," as Appellant claims. *See* Dkt. No. 84-4, Ex. 3, at 13 (noting that the "interest amount" had been calculated through "8-12-11," that the interest rate was 3.75%, and that the last date Appellant had paid was 10-21-11); Appellee's Opposition to Motion to Compel, Dkt. No. 71, at 4 (describing this document as the "account referral and suit authorization from" Sunrise to Appellee). In other words, the uncontested facts hardly support an inference that Appellee acted to willfully violate the law.

In light of the record before us, and after having reviewed the claims *de novo*, we affirm the District Court's decision to grant Appellee's Motion for Summary Judgment on Appellant's DCDCL claims.

## III. CONCLUSION

For the reasons set forth above, we remand the District Court's Order awarding Appellant attorney's fees in relation to her FDCPA claim so that it may review the Magistrate Judge's Report and Recommendation on this matter *de novo*. We affirm all of the other Orders challenged in this appeal.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: It is a time-honored bargaining tactic: make an unreasonable opening offer in an effort to "anchor" the ensuing give-and-take to an artificially high (or low) range of prices. Russell Korobkin, *Aspirations and Settlement*, 88 CORNELL L. REV. 1, 32 (2002). Even if the offer has no basis in reality and is rejected out of hand, it may for psychological reasons yield an artificially high (or low) final price. *Id.* at 32 & nn.151-53 (citing evidence that people "often begin [a negotiation] with a reference value . . . and then adjust from that point to arrive at their final determination," even if starting point does "not bear a rational relationship to the item subject to valuation"). That may be fine for selling a car or conducting a business negotiation. But a request for attorney's fees is not a negotiation.

Federal fee-shifting statutes typically authorize the recovery of a reasonable attorney's fee. If a party seeks more than that—making an excessive demand in hopes that the award, although short of the demand, will be artificially high—a district court can impose a sanction to deter future violations and to protect the integrity of its proceedings. In particular, the court has discretion to deny an award altogether or "impose a lesser sanction, such as awarding a fee below what a 'reasonable' fee would have been." *Envtl. Defense Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993).

I say all this because Radi Dennis, counsel for plaintiff Demetra Baylor, made what I consider a grossly excessive fee request. In Baylor's name, Dennis sought a total of $221,155 for her work on Baylor's $1,001 settlement and on the fee request itself.[1] The $221,155 demand was more than five times the $41,990 that a magistrate judge determined to be

---

[1] For simplicity, I round all monetary figures to the nearest dollar and all increments of time to the nearest hour.

reasonable. Reviewing for clear error, the district court overruled objections from both sides and awarded Baylor $41,990. The Court today holds, and I agree, that a remand is in order because the district court erred by not reviewing the magistrate's recommendation de novo.[2] Maj. Op. 3, 7-12, 26. The Court is careful not to dictate the outcome on remand, Maj. Op. 3, 12, and rightly so because of the district court's discretion in fee matters, *Copeland v. Marshall*, 641 F.2d 880, 901 (D.C. Cir. 1980) (en banc). I write separately only because, on reviewing the fee order, I am uncertain whether the district court recognizes just how broad its discretion is. On the extreme facts of this case—and because Dennis is a repeat offender, *see Jones v. Dufek*, 830 F.3d 523, 529 & n.6 (D.C. Cir. 2016) (affirming denial of excessive fee request Dennis made on behalf of another client)—I believe the court's discretion includes awarding a fee substantially below an otherwise reasonable one.

## I.  BACKGROUND

The Court details many of the facts, Maj. Op. 4-7, but I recount a few more to provide context for Baylor's fee request.

### A.  DENNIS'S WORK ON THE FDCPA CLAIM AND FEE REQUEST

Baylor attended graduate school, which she financed with student loans. Through an intermediary, one of Baylor's creditors enlisted defendant Mitchell Rubenstein & Associates (MRA), a law firm, to collect on the debt. In February 2013, MRA sent Baylor the first of several letters about the debt.

---

[2] I also agree that the district court correctly disposed of Baylor's claims under District of Columbia law. Maj. Op. 12-26. Accordingly, I join the Court's opinion in full.

The letters contained minor inadvertent discrepancies about (*inter alia*) the amount Baylor owed. *See* Maj. Op. 4-5. In March 2013, Baylor disputed the debt and retained Dennis for $325 per hour on a contingency basis. *See* Decl. of Radi Dennis ¶ 14 (Mar. 12, 2014).

Dennis almost immediately began researching the viability of a claim under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692 *et seq.* According to her billing records, she performed about 30 hours of FDCPA research between April and December 2013. During the same period, she had unfruitful settlement discussions with MRA.

Dennis spent about 56 hours researching, drafting, editing and serving Baylor's complaint against MRA. The complaint—15 pages long and filed in December 2013—alleged that MRA had violated the FDCPA and District of Columbia (D.C.) law. Eight pages of the complaint were devoted to factual allegations and other matters common to all counts. Four pages set forth Baylor's D.C. claims, which were ultimately unsuccessful. Only three pages were dedicated exclusively to Baylor's FDCPA claim.

MRA's president authorized a $1,001 offer of judgment on the FDCPA claim in order "to limit the time and expense of litigation."[3] Aff. of Mitchell Rubenstein ¶ 18 (Mar. 25, 2014); *see* FED. R. CIV. P. 68 ("Offer of Judgment"). MRA's counsel extended the offer to Dennis by certified mail on January 7,

---

[3] It did not have the intended effect. *See generally* Maj. Op. 1-26; 174 F. Supp. 3d 146 (D.D.C. 2016); 130 F. Supp. 3d 326 (D.D.C. 2015); 77 F. Supp. 3d 113 (D.D.C. 2015); 55 F. Supp. 3d 43 (D.D.C. 2014).

2014. The offer reached Dennis's address on January 17 but she waited until January 29 to open and read it.

In the meantime, on January 14, 2014, MRA moved to dismiss all counts of the complaint. Between January 18 and January 27—a ten-day period during which she should have known that MRA had offered to settle the FDCPA claim—Dennis wasted more than 87 hours researching and drafting Baylor's opposition to the motion to dismiss. She filed the opposition on January 27.

Dennis finally retrieved the offer of judgment on January 29, 2014. In the two weeks that followed, she spent about 34 hours researching Rule 68. Baylor accepted MRA's offer on February 28. The judgment was for $1,001 "plus costs and expenses together with reasonable attorney fees for all claims under the Fair Debt Collection Practices Act." J. on Offer and Acceptance (Feb. 28, 2014). The reference to "reasonable attorney fees" accorded with the FDCPA's fee-shifting provision, which states in relevant part that, "in the case of any successful [FDCPA] action," a debt collector who has violated the FDCPA "is liable" to the plaintiff for "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1692k(a)(3).

In Baylor's name, Dennis sought a "lodestar"[4] fee award of $155,700 for her work on the FDCPA claim and on the fee

---

[4] The "lodestar" method of calculating a fee award "looks to the prevailing market rates in the relevant community." *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010) (internal quotation omitted). It is meant to "produce[] an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Id*. (emphasis omitted).

request itself.[5]  She based the amount on two assertions: (1) she had spent a total of 346 hours litigating the FDCPA claim and fee motion, including at least 85 hours on the latter; and (2) her rate under the "*Laffey* Matrix"[6] is $450 per hour.  She subsequently sought another $40,075 for drafting Baylor's reply to MRA's opposition to the fee motion,[7] bringing the tally to $195,775.  And then she sought another $25,380 for 56 hours she allegedly spent responding (and seeking fees on the response) to MRA's five-page motion for sanctions and relief from judgment — a motion the district court denied in a three-page order.  In all, then, Dennis sought $221,155 in fees.[8]

---

[5]  Because Baylor did not succeed on her D.C. claims, she could not seek a fee award on them.  *See Brandywine Apartments, LLC v. McCaster*, 964 A.2d 162, 169 (D.C. 2009) ("successful" claim required).

[6]  The *Laffey* Matrix provides a "schedule of prevailing rates" for attorneys who litigate in the D.C. area.  *Eley v. District of Columbia*, 793 F.3d 97, 100-01 (D.C. Cir. 2015).

[7]  Dennis said she had spent more than 110 hours on the reply but was willing to give MRA a "discount."  Supplemental Decl. of Radi Dennis ¶ 6(f) (Apr. 1, 2014).

[8]  The $221,155 does not include an additional $48,195 that Dennis sought for preparing objections to the magistrate judge's report and recommendation on the fee award.  The district court concluded that the additional $48,195 was too attenuated from the FDCPA claim to be reimbursable.  Baylor does not appeal that ruling and MRA does not argue that the additional $48,195 is relevant to whether the earlier request was outrageously excessive.  I therefore use $221,155 as an extremely conservative figure for the total fee request.

MRA opposed the fee request, urging the district court to deny it *in toto* because it was grossly exaggerated.

### B. THE DISTRICT COURT'S FEE ORDER

The district court referred the fee request to a magistrate judge, who recommended awarding a fee but reducing the total to a reasonable amount: $41,990. Reviewing for clear error, the district court overruled both parties' objections to the magistrate's report and recommendation. 77 F. Supp. 3d 113, 117-23 (D.D.C. 2015). The court adopted the report and recommendation and thus awarded $41,990, which it considered "quite generous." *Id*. at 121; *see id*. at 115, 124.

In rejecting Baylor's claim for a larger award, the district court deferred to the magistrate judge's view that a "reasonable attorney" in Dennis's shoes would have spent about 93 hours on the FDCPA claim and the fee request. 77 F. Supp. 3d at 121. The court saw no clear error in the magistrate's conclusion that Dennis's time beyond 93 hours was (1) attributable to Baylor's D.C. claims, *id*. at 121-22 & n.6, and (2) "wasteful" and "unnecessary" because (*inter alia*) Dennis failed to timely retrieve MRA's offer of judgment, *id*. at 121-23 & n.5.

In rejecting MRA's entreaty to award nothing, the district court acknowledged cases permitting it to "reject[] an award outright" because of an "outrageous" request. 77 F. Supp. 3d at 118. Elsewhere the court remarked on the fact that Dennis "sought more than $220,000 in fees for a successful FDCPA claim worth only $1,001.00 to her client." *Id*. at 122. But the court discerned no clear error in the magistrate judge's recommendation against a sanction. *Id*. at 118-19. Because a fee award under the FDCPA "is mandatory in all but the most unusual circumstances," the court was reluctant to deny the fee request in its entirety. *Id*. at 119 (quoting *Carroll v. Wolpoff*

*& Abramson*, 53 F.3d 626, 628 (4th Cir. 1995)).   And in light of the already "significant reduction" to $41,990—a reduction the magistrate judge deemed necessary to make the award reasonable—the court was unpersuaded that any punitive reduction was necessary.   *Id.*

Both sides appealed.   Baylor claims the award is too low and MRA claims it is too high.

## II.   ANALYSIS

We and other courts of appeals have held, in several different statutory contexts, that a court may punish an intolerably excessive fee request by denying any award at all. *See, e.g.*, *Envtl. Defense Fund, Inc. v. Reilly*, 1 F.3d 1254, 1258 (D.C. Cir. 1993) (Resource Conservation and Recovery Act, 42 U.S.C. § 6972(e)); *Jordan v. Dep't of Justice*, 691 F.2d 514, 518 & n.37 (D.C. Cir. 1982) (Freedom of Information Act, 5 U.S.C. § 552(a)(4)(E)); *see also, e.g.*, *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 556-59 (5th Cir. 1998) (Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988(b)), *abrogated on other grounds as noted in Bailey v. Mississippi*, 407 F.3d 684, 686-87 (5th Cir. 2005); *Fair Hous. Council v. Landow*, 999 F.2d 92, 96-98 (4th Cir. 1993) (same); *Lewis v. Kendrick*, 944 F.2d 949, 958 (1st Cir. 1991) (same); *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980) (same). We have also recognized the authority to "impose a lesser sanction, such as awarding a fee below what a 'reasonable' fee would have been in order to discourage fee petitioners from submitting an excessive request."   *Reilly*, 1 F.3d at 1258.

The district court was hesitant to deny Baylor's fee request *in toto* because the FDCPA provides for mandatory fee shifting.   77 F. Supp. 3d at 119.   The concern is understandable but goes only so far.   True, the cases listed above involved statutes under which a court "may" award a fee,

5 U.S.C. § 552(a)(4)(E); 42 U.S.C. §§ 1988(b), 6972(e), whereas the FDCPA provides that a defendant "is liable" for a fee, 15 U.S.C. § 1692k(a). But at least two courts of appeals have suggested the FDCPA permits outright denial in "unusual circumstances." *Carroll*, 53 F.3d at 628 (4th Cir.); *Graziano v. Harrison*, 950 F.2d 107, 114 & n.13 (3d Cir. 1991). And even assuming arguendo that some "reasonable" fee is always required, 15 U.S.C. § 1692k(a)(3), the statutory text does not preclude a court from deciding—consistent with its inherent authority to protect the integrity of its proceedings, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-51 (1991)—that a "reasonable" fee in response to an exorbitant request is a nominal amount approaching zero.

I do not dispute that, if one leaves aside the magnitude of the fee request, $41,990 is reasonable — or at least represents a non-reversible determination of reasonableness within the district court's broad discretion. *See Morgan v. District of Columbia*, 824 F.2d 1049, 1066 (D.C. Cir. 1987) ("[W]e are ill-positioned to second guess the [district] court's [fee] determination."). Nor do I contend that the court *must* exercise its discretion to reduce the award for punitive reasons. But in deciding whether or not to do so, the court must start with the correct legal baseline. *See Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."). I am not sure the court started with the correct baseline here.

The district court suggested that, in light of the already "significant reduction" to $41,990, it did not need to reduce the award further as a sanction. 77 F. Supp. 3d at 119. But the question is not whether an *award of $41,990* is grossly excessive; it is whether a *request of $221,155* is grossly excessive given that a reasonable fee is $41,990. After all, the point is to deter unreasonable *requests*:

> If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked for in the first place. To discourage such greed a severer reaction is needful, and the District Court responded appropriately in [denying an award entirely].

*Brown*, 612 F.2d at 1059; *see Reilly*, 1 F.3d at 1258 (approving *Brown*'s rationale in our Circuit); *Landow*, 999 F.2d at 98 (forbidding "gamesmanship" of filing excessive request "in the hope that the district court [will] at least award some, preferably high, percentage of the requested fees"); *Lewis*, 944 F.2d at 958 (emphasizing that fee request is "not an opening gambit in negotiations to reach an ultimate result").

None of this is to say that denial or reduction of fees is routine punishment. As the Court explained in *Jordan*:

> Total denial of requested fees as a purely prophylactic measure . . . is a stringent sanction, to be reserved for only the most severe of situations, and appropriately invoked only in very limited circumstances. Outright denial may be justified when the party seeking fees declines to proffer any substantiation in the form of affidavits, timesheets or the like, or when the application is grossly and intolerably exaggerated, or manifestly filed in bad faith.

691 F.2d at 518 (footnotes omitted). Still, the sanction is not as rare as hen's teeth. In several of the cases cited above, a fee

was denied or reduced as punishment for a grossly excessive request. *Reilly*, 1 F.3d at 1258-60; *Scham*, 148 F.3d at 556-59; *Landow*, 999 F.2d at 96-98; *Lewis*, 944 F.2d at 954-58; *Brown*, 612 F.2d at 1059. In *Reilly*, for example, this Court reduced a fee request for "outrageously excessive time entries," noting especially that the attorney had tried to claim hours that were "about three times what the work should have required." 1 F.3d at 1259-60. Likewise in *Landow*, the Fourth Circuit reversed a fee award in its entirety because the request on which it was based was "outrageously excessive" insofar as it did not carve out hours spent on unsuccessful claims. 999 F.2d at 97-98. And in *Lewis* the First Circuit reversed an award because the lawyers' fee request was intolerably out of sync with the "degree of success [they] obtained" for their client. 944 F.2d at 956, 958 (internal quotation omitted).

The sanction may be "strong medicine," *Lewis*, 944 F.2d at 958; *see Jordan*, 691 F.2d at 518, but an equally strong case can be made for it here. The record suggests that Dennis, desiring an artificially large award, impermissibly treated the $221,155 fee request as an opening bid. *Compare Reilly*, 1 F.3d at 1258; *Landow*, 999 F.2d at 97-98; *Lewis*, 944 F.2d at 958; *Brown*, 612 F.2d at 1059; *see also* Korobkin, *Aspirations and Settlement*, 88 CORNELL L. REV. at 32-33. The hours she reported are difficult to explain any other way. She reported the 87 hours she had spent opposing MRA's motion to dismiss. She claimed those hours even *after* realizing they had been wasted because she did not timely open her mail.[9] She claimed 34 hours for researching Rule 68 when a few hours should have sufficed. She claimed at least 85 hours for the fee motion itself. She claimed *110 hours*—nearly three standard work weeks at a total "discount" price of $40,075—for

_____

[9] It is one thing to make a mistake. It is quite another to bill it to someone else, especially when it costs $39,150 (87 x $450).

replying to MRA's opposition to the fee motion. And she claimed 56 hours for responding (and seeking fees on the response) to MRA's five-page motion for sanctions.

Through Baylor, Dennis sought more than *five times* the amount the magistrate judge thought reasonable and the district court thought "quite generous." 77 F. Supp. 3d at 121; *see id.* at 124. In *Reilly* we cut back a request because (*inter alia*) the lawyer tried to claim hours that were "about three times what the work should have required." 1 F.3d at 1259. *A fortiori*, that case counsels a similar result here.

Moreover, Dennis sought nearly *221 times* the $1,001 she recovered for Baylor. The client's "degree of success" is ordinarily a "critical factor" in calculating a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *see Goos v. Nat'l Ass'n of Realtors*, 68 F.3d 1380, 1387 (D.C. Cir. 1995). The First Circuit in *Lewis* believed it "inexcusable" that the lawyers there sought "payment . . . amounting to 140 times the worth of the injury." 944 F.2d at 956. I believe the same conclusion is warranted here. Dennis spent more time working on fee matters than on tasks essential to Baylor's FDCPA claim. The time she spent on the fee motion (at least 85 hours) and the reply to MRA's fee opposition (110 hours) easily exceeded the time she spent researching the FDCPA (30 hours) and working on Baylor's complaint (56 hours) — the latter of which was devoted in part to D.C. claims that Baylor *lost*. *See Landow*, 999 F.2d at 97-98 (fee request excessive because it did not discount work on unsuccessful claims). No wonder the district court said of the fee request that "the tail [is] wagging the dog . . . in this case." 130 F. Supp. 3d 326, 337 (D.D.C. 2015).

In short, Dennis lost sight of the real party in interest. As further proof, recall that she sought the *Laffey* rate of $450 per

hour despite having agreed to represent Baylor for $325 per hour. Dennis has not explained the discrepancy, at least not in this Court. Nor can the FDCPA support such a windfall. The fee-shifting provision states that the defendant is liable to the *plaintiff* for a reasonable attorney's fee. 15 U.S.C. § 1692k(a) ("[A]ny debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to *such person* . . . ." (emphasis added)). In other words, the district court is to award Baylor whatever the FDCPA litigation reasonably cost her. And Baylor's contingency agreement with Dennis manifests that, at least for the latter's services, the litigation cost her $325 per hour. *See* Decl. of Radi Dennis ¶ 14 (Mar. 12, 2014). The extra $125 per hour—a good living for most people—is nothing but avarice.

Importantly, such excess in a fee request is not victimless: the money has to come from someone. Here the money comes from MRA. 15 U.S.C. § 1692k(a) ("debt collector . . . is liable"). Yes, MRA owes damages, costs and a reasonable attorney's fee. But by law that is all it owes. Assuming $41,990 is a reasonable attorney's fee,[10] Dennis improperly demanded $179,165 of MRA's money. Thankfully, the tactic did not succeed. If similar demands become the norm, however, they will sow distrust and spawn satellite fee litigation — one of the last things lawyers and judges should be spending their time on. *See Carroll*, 53 F.3d at 628 (noting

---

[10] Lest it be forgotten, I repeat here that Dennis believes $41,990 is unreasonably low. Br. of Appellant 22-48. I have my doubts but acknowledge that the matter is for the district court. *Morgan*, 824 F.2d at 1066. The court may conclude on de novo review of the magistrate judge's report and recommendation that a reasonable fee is higher or lower than $41,990. If it does so, the new number will become the baseline from which the court must decide whether Dennis's request of $221,155 was grossly excessive.

"systemic costs" of satellite fee litigation, which is "one of the least socially productive types of litigation imaginable" (internal quotation omitted)). For fee-shifting to work properly, a court must be able to depend on counsel for a measured accounting from the outset. Dennis's accounting was nowise measured.

In the event the district court concludes on remand that the fee request was grossly excessive, such that the award needs to be further reduced, the following considerations may aid its calculation. First, for reasons already explained, I think the court should award $325 per hour instead of $450. Second, I think the court may deny Dennis any credit for fee-related pleadings. *See Trichilo v. Sec'y of HHS*, 823 F.2d 702, 708 (2d Cir. 1987) ("If counsel makes inflated or outrageous fee demands, the court could readily deny compensation for time spent in pressing them, since that time would not have been reasonably spent." (internal quotation omitted)). Indeed, I do not think it would be an abuse of discretion to award Dennis the same amount she won for Baylor: $1,001. Steep overbilling ought to come at a steep price.